## THE S. S. WILHELM.

### VANCE et al. v. THE S. S. WILHELM.

(Circuit Court of Appeals, Sixth Circuit.    November 6, 1893.)

No. 52.

1. ADMIRALTY—APPEAL—WEIGHT OF EVIDENCE—FINDINGS BELOW.
   Where a decree of the district court in admiralty on conflicting evidence is sustained by the circuit court on appeal, the circuit court of appeals will not reverse the findings below, though it might originally have reached a different conclusion.

2. TOWAGE—LOSS OF TOW.
   A tug with two vessels in tow, all lumber laden, bound down Lake Huron to Tawas, after passing Thunder bay, was struck by a violent northeast gale, with heavy snow. The master made allowance for leeway by sailing one point to windward of the usual course, but finding, from the shoaling of the water, that his distance from shore had decreased from 5 miles to 3 in running less than 6 miles, he stood out for about a mile, and then resumed his former course, the water shoaling from 9 fathoms down, for about 10 miles. When near Au Sable point, he again rounded to, in executing which maneuver the towline parted, and the tow went ashore. *Held*, that the loss was caused by the negligence of the master in bringing his tow so near the shore, and the tug was liable therefor. 52 Fed. 602, reversed.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

In Admiralty. Libel by Emery J. Vance and others against the propeller S. S. Wilhelm for loss of a tow. The district court dismissed the libel, (47 Fed. 89,) and, on appeal by libelants, its decree was affirmed by the circuit court. 52 Fed. 602. Libelants again appeal. Reversed.

Harvey D. Goulder and Simonson, Gillett & Courtright, for appellants.

F. H. Canfield, for appellees.

Before BROWN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

TAFT, Circuit Judge. The libelants and appellants, Emery J. Vance and others, owned the barge or schooner Mears, and filed their libel to recover damages for the total loss of the barge while being towed by the steam barge Wilhelm from Cheyboygan, Mich., to Tawas, Mich. The towline between the propeller and the Mears parted in a storm on Lake Huron, a little to the north of Au Sable or Fish point, on the western shore of the lake. The Mears went ashore and was broken up, and her cargo of lumber was completely destroyed. The libel charged that the loss occurred through the negligence of the Wilhelm, and pointed out five faults in which negligence was shown:

(1) That the propeller was not properly officered and manned.

(2) That the propeller attempted to tow the Mears and the Midnight, another lumber-laden barge, across Lake Huron, during a violent and increasing storm, instead of taking them to the only accessible and safe shelter, in Thunder bay, as she could have done without difficulty, and as ordinary and prudent seamanship required her to do.

(3) That after going about and holding her tow, head into the wind, about four miles off shore, and attaining this position of comparative safety, she negligently resumed her course on a lee shore in a furious gale.

(4) In negligently pursuing a course down the west shore of Lake Huron in a thick, driving snowstorm, and with a heavy wind and sea from the northeast, without making sufficient allowance for the leeway caused by such storm and wind.

(5) In negligently turning at full speed into the lake, so sharply as to part her towline, whereby the Mears was necessarily rendered helpless in such close proximity to the lee shore, and her destruction was thereafter inevitable.

All these faults were denied, and after a full hearing of the evidence the district judge held against the libelants, and dismissed the libel. On appeal the circuit judge refused to disturb the findings of the district judge, and affirmed the decree.

It is well settled that every presumption is in favor of the correctness of a decree in admiralty that comes into the court of last resort sustained by the district judge in the original hearing and the circuit judge on appeal, and that the appellate court will not disturb such a decree unless a manifest mistake is made clearly to appear. The appellate court will not reweigh conflicting evidence, though it might originally, upon such evidence, have reached a different conclusion from that announced in the courts below. The S. B. Wheeler, 20 Wall. 385; The Richmond, 103 U. S. 540; The Quickstep, 9 Wall. 669; Newell v. Norton, 3 Wall. 267. With this presumption in favor of the appellees, we proceed to the consideration of the issues of the case.

The obligation of the towboat to the tow is well defined. The highest possible skill is not required of the towing vessel. She is bound to bring to the performance of the duties she assumes reasonable skill and care, and to exercise them in everything relating to the work until it is accomplished. The want of either in such a case is a gross fault, and the offender is liable for the full damages resulting therefrom. The Margaret, 94 U. S. 494-497.

With reference to the first fault charged, namely, that the steamer Wilhelm was not properly manned, there was no evidence whatever to sustain it, and the issue was properly found against the libelant.

With reference to the second charge, namely, that the master of the propeller was negligent in not taking refuge in Thunder bay, instead of proceeding on his course to Tawas, a point 60 miles below Thunder bay light, the evidence was very conflicting as to what the condition of the wind and weather was at the time when it would have been possible to go into Thunder bay, and as to whether

there were any indications, upon which a prudent master should have acted. of the approach of the furious storm and gale which subsequently prevailed. Whatever might be our original view of this evidence, we think that there was no such preponderating weight in favor of the libelants' contention that we ought now to reverse the finding of the district and circuit judges upon this point.

We come now to the third fault charged, namely, that the master of the Wilhelm, after rounding to and heading into the wind, did not remain in that position, but resumed his course down the lake. It is conceded by all the witnesses in the case, and found by the district judge, that about 7 o'clock, or shortly thereafter, the tow was struck by heavy squalls from the northeast or east-northeast, accompanied by snow, and that from that time until the loss of the barges, about 2 o'clock in the afternoon, the wind blew a gale from the northeast, accompanied by heavy snow; that about 9 o'clock, when off Sturgeon point, a distance of about 25 miles from Thunder bay light, the Wilhelm, which was heavily loaded with lumber on deck and in her hold, lost her starboard deck load, and that this gave her a heavy list to port, and made her steer badly; that at this time the lead showed her in 7 fathoms of water or about 3 miles from shore; that thereupon she rounded to and headed into the wind while her cargo was being trimmed; that she remained in this position for 1½ hours, working slowly to the windward to a point where the lead showed 9 fathoms, when she turned and resumed her course, S. ½ E., down the shore of the lake; that as she went on this course for 1½ hours or 2 hours the lead showed that she was shoaling; that she rounded to again, and during this maneuver, or shortly thereafter parted the towline; that within 15 or 20 minutes the tows, which had failed to secure themselves by anchor or by sail, were aground, and were beaten to pieces. An examination of the evidence inclines us to think that it would have been much better judgment on the part of the master of the Wilhelm to have remained head up to the wind when he first rounded to, until the fury of the storm had abated, than to go down the lee shore in search of the harbor of Tawas, which, confessedly, could not have been found in a snowstorm, with the wind blowing from 40 to 60 miles an hour. We think that the chances of saving his tow were very much better to maintain the position where he then was, in which he was able to make headway against the wind, than to move in the direction of a port which he certainly could not make until the storm had abated; but in view of the conclusion reached by the district and circuit judges with the witnesses before them, expert and otherwise, we should not feel disposed to reverse this case on such a ground, and are willing to concede that it was an error in judgment, not amounting to negligence or fault, for the master to resume his course. We therefore do not sustain the appeal from the finding with respect to the third issue.

Coming now to the fourth fault charged, that of negligently taking a wrong course too near the lee shore, we think the appeal must be sustained, and the decree reversed.

The usual course of vessels from Thunder bay to Tawas, in

fair weather, is S. ¼ W. The course sailed by the Wilhelm was S. ½ E.; that is, the master made allowance for leeway by sailing one point to the windward of the usual course. The master of the Wilhelm states that he passed Thunder bay light from 7 to 10 miles out, and that after running 35 or 40 miles, measuring by his log, he found himself 3 miles from shore, in 7 fathoms of water; that, in the 5½ miles just preceding his rounding to, the lead had shown a shoaling of from 13 fathoms to 7 fathoms, which, the master himself admits, proved that his distance from shore had decreased from 5 miles to 3 miles in going less than 6 miles. It is in evidence, and admitted on all sides, that along this shore the bottom of the lake gradually shelves so that the lead enables the mariner to judge quite accurately his distance from the shore, and that 7 fathoms is about 3 miles from shore, and 13 fathoms about 5 miles. The storm, which had begun at 7:30, continued until 2 o'clock. This is admitted. It was thus apparent, and was admitted by the master to have been known to him at the time, that under the influence of this northeast wind and gale his leeway had been 2 miles in a progress of less than 6 on a course S. ½ E. He pulled out into the lake, he thinks, about 1 mile. This estimate was confirmed by the cast of the lead, which showed 9 fathoms when he resumed his course. He still maintained his course S. ½ E. He was then 4 miles from shore. He ran that course, shoaling from 9 fathoms down, for 2 hours, or about 10 miles. If his leeway continued to be the same, his distance from the shore must have been reduced to less than a mile, and he would have brought up in the breakers near Au Sable point. There is nothing to show why the leeway did not continue the same in the undiminished violence of the gale. These facts, which do not seem to have been considered by the learned judges below, are taken from the testimony of the master himself, and make it mathematically demonstrable that when he rounded to a second time, after running 10 miles, he was in or near the breakers, and that his evidence, and that of his mate, that they were then in 7 fathoms of water, and never less, and were never less than 3 miles from the shore, are untrue.

We find that the master, in the log which he prepared a week after the loss with a view to the litigation, says that the lead showed 6 or 7 fathoms. Hill, the master of the Midnight, the other tow which went ashore, now in the employ of the claimants, says that the captain told him that he got 5 fathoms or less. Two witnesses testified in the circuit court after the appeal. One of them, Robert Hovenden, was the notary who took the master's protest and delivered it to the master as soon as it was executed. Singularly enough, the captain did not produce it, or explain its absence. Hovenden testified that in the protest the captain stated that he was surprised at the storm, which prevented him from seeing the shore, and when he did see the shore he was so close to it that, inevitably, he would have gone on it, if he had not turned away, and in doing so the rope broke; that he did the best he could to save the tow, but he was not able to save it, because all of them would go if he had not turned out.

Another witness, Bristol, a marine reporter, and a correspondent of the Chicago, Detroit, Cleveland, and other papers, who visited the scene of the wreck the day after, with the master of the Wilhelm, to find the barges, testified that the master said that he had expected to weather the storm and reach Tawas safely; that at times it would lighten up somewhat, and during one of these times he saw that he was quite close to the land, and that in putting his helm over hard, to sheer out and keep away from the land, in that way he parted his towline. These were wholly disinterested witnesses, so far as the record shows, and their evidence, which was clearly admissible, (see The Potomac, 8 Wall. 590; Packet Co. v. Clough, 20 Wall. 540,) fully confirms the necessary conclusion from the facts admitted by the master. This conclusion also finds strong confirmation in the short time which it took for the barges to ground after the parting of the towline. We think, therefore, that the presumption arising in appellee's favor from the decrees below is overcome, and we must find that it was the negligence of the master which brought the vessels into a position of great peril, a short distance off of Au Sable point.

The master ought to have known that his course, if continued, would bring him into a position of such imminent peril that escape was only possible by suddenly executing the maneuver of rounding to with his tow in this furious gale. That was the natural result of his negligent navigation. Such a maneuver, executed in extremis, could not but strain the towline, and would probably cause it to part, either in the maneuver or soon after. The parting of the towline near or in the breakers made the loss of the barges, cast adrift with no time to anchor or set sails, a matter of minutes. We are therefore of the opinion that as the negligence of the master, in bringing his tow so near to the shore, might have been expected to result in the loss, (The Elfinmere, 39 Fed. 909,) it was the proximate cause of the loss. It is no answer to say that, had he kept out in the offing, the fury of the storm might there have parted the towline, and cast adrift the tows to destruction. Whether the towline would there have parted, or whether the tows, if cast adrift in the offing, might not have anchored or set sail, and have ridden the storm safely, we cannot tell; but that the loss, as it did occur, was due to the negligent navigation of the master of the Wilhelm, is certain. To relieve the Wilhelm of responsibility for such negligence, the burden is on her to show that the loss would have followed, even if the master had not been negligent, and that burden she cannot sustain.

It is said that whether the rounding to was sudden or not was an issue of fact before the district and circuit judges, and that they found that it was careful and deliberate. We do not so understand their finding. They found that the rounding to was not done in a negligent manner, under the circumstances, and we do not disagree with them. The language of the district judge is as follows:

"Lastly we come to the parting of the towline. It is said this was caused by too abruptly turning about in making the maneuver of hauling head to the

wind off Fish point. It seems to the court quite idle to seek for any other cause for the parting of this towline than the resistless force of the storm itself, described in the proof, which swept Lake Huron. Why should we go below the decks of this propeller, laboring in a mighty·storm, from which her cargo was being swept by the angry waters, to examine in her flooded engine room, her diminished steam and somewhat shackled engine, listen for the sound of her signal above the howling of the furious winds, watch the hasty and trembling movements of her death-threatened officers and crew, to inquire whether this turning to the wind, almost in extremis, for safety from the driving storm, was more or less abrupt in its relation to a towline chafing in the chock, although sufficiently parceled, they say, or whether everything was done precisely as it ought to have been done in the face of such an extraordinary storm, when we find in its violence a tremendous and unusual force, abundantly capable of causing this disaster? The court finds, the parting of the line to have been caused by the fury of the storm, and that it was an act of God, against which the owners of the Wilhelm did not insure the vessel of the libelants."

It is obvious from the foregoing that the question whether the maneuver was a sudden one or not, and whether the towline parted during its execution or not, was immaterial, in the view of the district judge. He thought, and so do we, that the maneuver was under circumstances where careful and deliberate action was impossible, and that it was in extremis, and that, therefore, negligence was not chargeable. We fully agree with this, but it seems clear to us that the extremity in which the master found himself was one to which, by proper navigation, he would not have been exposed.

We do not know that it is material whether the towline parted in the maneuver, or shortly thereafter, because it was something which the master was obliged to contemplate as possible or probable, and to provide against loss from, by keeping far enough off the shore to enable the tows to shift for themselves, if cast adrift. However this may be, our conclusion as to the circumstances of imminent peril under which the tow was rounded to, taken in connection with the other evidence, makes it clear to us that the line parted before the maneuver was completed, and that it was caused by the consequent extra strain. In this conclusion we do not overrule a finding of the court which originally heard the case, because, as already shown, the issue was not regarded as material, and the evidence was not weighed with a view to a definite conclusion thereon.

The decree of the court below is reversed, with instructions to assess the damages of the libelants, and enter a decree in their behalf for the amount assessed.