### THE GARDEN CITY.

### DAVIS et al. v. BOLAND et al.

(Circuit Court of Appeals, Sixth Circuit. January 18, 1904.)

#### Nos. 1,183, 1,184.

1. TOWAGE—INJURY OF TOW—LIABILITY OF TUG.

The master of a tug is bound to possess and exercise such degree of skill and judgment for the protection of his tow as might fairly be expected from a man of his calling under the circumstances in which he is placed, and, if he fulfills such measure of duty, the vessel is not liable because a loss or disaster to the tow may result from an error of judgment on his part.

2. SAME—EVIDENCE CONSIDERED.

The steamer Garden City, 140 feet long, with two barges in tow on a line, passed out of the Portage Ship Canal, going westward, in Lake Superior, at 6 in the evening, and at 9, when 15 miles distant, the wind became so strong from the west that she could not make headway, and she turned, and made again for the entrance to the canal. In attempting to pass in, the barges drifted to leeward of the entrance, and one was beached and injured. *Held*, on the evidence, that the steamer was not in fault either for leaving the canal, the wind not being strong enough at that time to render it imprudent, or for attempting to take her tows into the canal again, the entrance to which was 250 to 300 feet wide, instead of seeking a refuge behind Keweenaw Point, which would have required her to go 70 miles, or for negligent navigation in attempting the entrance to the canal; but that, on the contrary, the evidence showed that good seamanship required her to endeavor to get back into the canal, rather than to attempt to go around the point, and that the failure of the tows to make the entrance was due to the faulty steering of the rear barge.

Appeal from the District Court of the United States for the Eastern District of Michigan.

Potter & Wright, for appellants.

John C. Shaw, Charles B. Warren, William B. Cady, and Herbert K. Oakes, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. These appeals are in one and the same case; that first entitled being one by claimants from the decree condemning the steamer Garden City in damages, and the other one by the libelants from the refusal of the District Court to include interest on the penalty of the bond given by the claimants for the re-

¶ 1. See Towage; vol. 45, Cent. Dig. § 13.

lease of the vessel in fixing the extent of the liability. The libelants were the owners of the barge Wenona, and they charged that their vessel and the barge J. C. King had been taken by the Garden City to the port of Houghton, on Lake Superior, where their cargoes of coal were unloaded, and were chartered to proceed from thence to Ashland, Wis., to take cargoes of lumber; that when, on the afternoon of September 7, 1898, the steamer was about to take them in tow through the Portage Lake Ship Canal and out on the trip to Ashland, there were indications of bad weather, and the master of the Wenona remonstrated with the master of the steamer against starting out at that time; that the master of the steamer would not regard the remonstrance, and, having taken the barges in tow—the King first and the Wenona second—proceeded out through the canal, and westward on the course to Ashland; that when, about 6 o'clock p. m., they got out into the lake, the wind, which had been blowing from the west, increased, raising a heavy sea; that they kept on their course, making slow progress, until about 9 o'clock, when the steamer, unable longer to make headway, was turned about, and, taking her tow with her, proceeded as if to retrace her course and make for the port they had last left; that the master of the Wenona trumpeted to the master of the King, and requested him to notify the steamer that he did not think it practicable to make the canal, and requesting the master of the steamer to go around Keweenaw Point to find a lee, and that the master of the King conveyed the message to the master of the steamer, but that the master of the steamer disregarded the request and made for the canal; that on heading up for entering the piers at the northern entrance of the canal the barges drifted to the leeward so far that they could not be taken into the canal, but could still have been taken around Keweenaw Point; that just as the steamer reached the entrance she sounded several blasts of her whistle and threw off the tow-line to the King; that only the steamer succeeded in getting into the entrance safely, and that the Wenona, although she threw her anchor out, went ashore on the beach, and from her stranding there suffered the damages for which the libel was filed. Numerous faults are specified, which include charges of incompetency and negligence on the part of the officers and crew of the steamer and mismanagement all along the course out, the return and the endeavor to get into shelter at the canal. But the gravamen of the errors charged and relied upon consists of the alleged want of reasonable skill and judgment in failing to go around Keweenaw Point for shelter, instead of taking the tow back to the canal and trying to take it in there.

The answer of the respondents, while admitting the more general outlines of the case made by the libelants, denied all the faults charged, denied that the Wenona's master raised any objection to the starting off on the trip, as alleged in the libel, or that when on the return he made known to the master of the steamer any request to be taken around Keweenaw Point, or any objection to the endeavor to reach shelter by way of the canal; and charges that the Wenona was at fault on coming in to make the entrance in holding her head so stiffly to windward that the King was held up at the stern, and was unable to control her own course so as to follow the steamer, whereby the

tow' became so unmanageable that the steamer could not prevent the disaster which happened. Proofs were taken, and a decision was reached by the District Court in favor of the libelants, grounded upon the fourth and fifth specifications of fault charged in the libel as follows:

"(4) In not taking her tow to shelter behind Keweenaw Point, which place was readily accessible, and would have afforded perfect shelter.

"(5) In attempting to take her tow into the narrow entrance of the Portage Canal under the conditions then existing.".

In order to have reached this conclusion, the learned district judge must have been of opinion that the master of the steamer failed to exercise that measure of skill and judgment which he owed to the tow, in that he tried to take the latter into the harbor at the canal instead of trying to take it around and under the lee of Keweenaw Point. We are not satisfied that such an opinion is well founded. The result may have some tendency to show that the master of the steamer made a mistake in his choice of the courses open to him. But whether it has such tendency depends upon the other circumstances of the case, to which we shall presently give attention. Still the test of liability is not the result which occurred, but is whether the master possessed and exercised a reasonable degree of skill and judgment, such as might fairly be expected of a man of his calling in the circumstances in which he was placed. He was bound to this measure of duty, and, if he failed to discharge it, his ship would be responsible for the damages ensuing. But this responsibility is not that of an insurer. Nor is he to be held at fault simply because a disaster or loss has happened, if, being qualified, he has fairly exercised his best judgment in the emergency, and behaved as a prudent man would in similar affairs of his own. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Burlington, 137 U. S. 386, 11 Sup. Ct. 138, 34 L. Ed. 731; The S. S. Wilhelm, 59 Fed. 169, 8 C. C. A. 72; The W. H. Simpson, 80 Fed. 153, 25 C. C. A. 318; Pederson v. J. D. Spreckles & Bros. Co., 87 Fed. 938, 31 C. C. A. 308. From the record we find that the Garden City was a comparatively small steamer, about 140 feet long; the J. C. King, the first in tow, was 175 feet in length; and the Wenona 193 feet. All were in seaworthy condition, and on the trip to Ashland all were going light, the steamer drawing 12 feet aft and 1 foot forward. The preponderance of the evidence is that, while there were some indications of rough weather, they were not so serious as to deter a man of common prudence from proceeding. The libel charges, and the master of the Wenona testifies, that he remonstrated against going out. The evidence leaves this matter in doubt, as it does also the allegation that the master of the Wenona communicated to the master of the Garden City on the return a request that the tow be taken around Keweenaw Point. But, assuming these doubts to be resolved in favor of the libelants, it remains that the master of the Garden City was entitled to judge of the expediency of proceeding on the voyage. The district judge finds that the weather was fair at the time of the departure of the vessels, and he does not find that it was imprudent to leave. After the vessels got on their course, the wind, which had not been strong, continued to increase, coming from nearly due west; and after they

had made about 15 miles, and were then some 5 miles off shore, it became so severe, and the sea so rough, that the steamer was unable to hold her course, and was blown around. It became apparent that the vessels could not proceed, but must seek shelter. In this emergency the question was presented to the sound discretion of the master of the Garden City as to what place of shelter he had best seek. He thought it best to go back to the shelter at the Portage Lake Ship Canal, and proceeded accordingly. If, in adopting this course, he was grossly imprudent, his ship is liable for all the consequences which happened and were reasonably to be expected from it, but not for such as were brought about solely by the fault of others. But if his choice was a mere error of judgment there was no liability, even though the mistake was demonstrated by the result. Undoubtedly, serious embarrassment confronted the Garden City. The difficulty of getting into the canal would be met in turning in after that locality should be reached, where the wind would be abaft the beams of the vessels, and would have a strong tendency to drive them to leeward, and embarrass them in holding up to their proper course to make the entrance. But the piers of the canal were 240 or 250 feet apart, and the western pier extended considerably further out than the eastern. The master might not unreasonably have thought he could make allowance for the tendency of his tow to drift to leeward before the wind when he should come to make the turn. He had the right to expect that the vessels in tow would, by proper handling of themselves, co-operate in making the entrance safely. The distance back was only about 15 miles, and the main course would be made with the wind astern. On the other hand, the distance around Keweenaw Point was 70 miles, and probably more than that to any place where shelter would be found. The course along the shore would require a change to the northward of from one and a half to two points from the course back to the canal, and would have exposed the port side of his vessels more to the wind, which had already shifted somewhat to the north. He could not know to what point the wind might shift, or to what velocity it might increase, before he could round Keweenaw Point. The wind might drive him and his tow ashore before he could get so far. It was night, and there was no refuge short of the point. The point was low, and he would have to come about into the wind and make a considerable distance before finding shelter. We confess that we think it a harsh judgment to say that, in the face of these considerations, there was gross imprudence in concluding to go back to the canal, rather than to take the other course.

But the claimants called three experts, who had been masters of long experience on the lakes, and to questions propounded to them, which substantially presented the emergency in which the Garden City was placed, they severally answered that good seamanship would require an endeavor to get back into the canal, and not to attempt to go around Keweenaw Point. These witnesses were disinterested. No experts were called by the libelants. For reasons which we do not understand, but which he no doubt thought sufficient, the learned district judge ignored the testimony of the masters to which we have referred. It would seem, if this testimony was honestly given—and

we see no reason for thinking it was not—it would press hard against a conclusion which can only be supported by proof of gross error.

For the appellee it is contended that the sequel demonstrates the lack of good seamanship in making choice of the shelter of the canal. In going in the barges failed to make the canal. As the J. C. King was approaching the entrance, she was heading on the end of the eastern pier, and, seeing little chance of getting into the canal, she put her wheel to starboard, and went along the east side of the pier, and finally stopped without much damage. The Wenona was drawn off to leeward by the pull of the King and the force of the wind so much that she could not keep up sufficiently to make the entrance, and, seeing this, she threw off her towline and dropped her anchor. She drifted to the leeward of the King and went on the beach as above stated. The evidence touching the incidents of this part of the return passage is conflicting. The appellees seem to take an uncertain stand in regard to the question whether they will insist that the accident to their vessel was due to bad management on the part of the Garden City in making the entrance, or was due to the mistaken choice of the master in coming to that harbor for refuge. To contend for the first position practically admits that by good seamanship on the part of the Garden City the Wenona might have been saved, and this would go far to relieve the charge of fault in making the choice. We think, however, we should understand the position of the appellees to be that the sequel is convincing evidence to show how impracticable it was to get into that shelter, and how gross the error of the master of the Garden City was in attempting it.

The reason assigned by the libelants for the inability of the steamer to take the barges in is that the wind and sea bore so hard on the windward side of the vessels after they rounded in that they could not be kept up or prevented from being cast on the eastern pier, or on the beach outside. Upon examination of the evidence bearing upon this subject, we are convinced that the failure to make the entrance was due not so much to the stress of weather or the lack of seamanship on the part of the Garden City as to the want of proper co-operation on the part of the barges. The most reliable of the evidence indicates that the wind was blowing from nearly westward at about 24 or 25 miles an hour, and that when the steamer began to make the turn to go in the vessels were about a mile, or a little less, off the entrance, and somewhat to the westward of the range made by the lights standing one at the outer end of the western pier, and the other farther in on the margin of the same pier—a range established for guiding navigation from the lake into the canal, and the reverse. At the time when the vessels had made the turn they were from half to three-quarters of a mile away from the entrance. On making the turn the barges drifted somewhat to the eastward, but not so far but that, if they had both been maneuvered properly, they should have come up and followed the steamer in. The latter, on seeing the King sagging off, blew warning whistles to the tow to straighten up. The King did not take effective measures for doing this, and was embarrassed by the Wenona, which held up so far to starboard as to prevent the stern of the King from turning to leeward; the effect of which must

have been to compel the King to run off to leeward of her proper course. The ultimate effect of all this was that the King drew the Wenona after her, and, when the King's fate became evident, the Wenona, being headed too far to the east, let go her line and cast off her anchor, but the wind and her own momentum carried her to the beach.

We are aware that the master of the Wenona states that the tow was five miles off shore when they began to make the turn to go in, and there is some other evidence in the record to the same effect. If we believed this, while we should think it would deprive the result of any significance as tending to show that the choice of shelter was itself a mistake, we should have thought the steamer ought to have been held guilty of a gross fault. But such a course of conduct is improbable, and the weight of the evidence tends to a different conclusion; and the court below found the fact to be against the libelants' contention. Supposing this to be a mistake on the part of the master of the Wenona, it considerably affects the accuracy of his judgment and the effect to be given to his account of subsequent events. We are convinced there could not have been the prolonged sagging off to leeward which he emphasises in his testimony, and the fact that the steamer sounded its warning whistles but once before she got to the pier loses much of its significance if the sagging off was shortly before the entrance was reached. Again, if the fact be as we find it, there is little or no ground for the contention that the steamer, on seeing its tow so much disordered as to endanger its progress, should have then turned for Keweenaw Point.

Then as to the conduct of the barges, the master of the King, who seems to have been a disinterested witness, and in position to know and appreciate the facts as well as any one, gives a clear and intelligible account. His testimony shows, as we think, that he did not change his helm soon enough when they came to make the turn, and that in consequence he got rather too far to leeward. But it also shows that when he put his helm over to bring his boat up, the Wenona kept hauling off to windward so that the King did not answer her helm, but ran off—"crippled" him, as he says—and that he called out to the Wenona that "if he didn't hold on he would cut his tow line." His story is corroborated by the mate and steward of the King, and seems to be in accord with the other facts about which there is no dispute. And upon the point we are now considering it is not difficult to find in the testimony of other witnesses statements which give color to the account of the master of the King. Several witnesses testify that when the vessels were making the entrance the Wenona was headed up to windward, and that the King was headed to leeward, running toward the eastern pier. The only reasonable explanation of this position of the King is that her stern was held up by the Wenona; for the pull of the steamer was to windward, and, this being so, the tendency of the wind would have been to carry the stern of the King to leeward. The effect of this position of the King would also have a tendency to draw down the stern of the steamer, and reconcile some of the evidence to the effect that the steamer went in at an angle. And this position of the vessels must have been taken not long before the

steamer got in, for all the evidence concurs to the effect that the King could not long have been running in that direction. The experts also testify that with proper handling of the vessels in tow the steamer might reasonably be expected, under conditions which we believe accorded with the facts, to get them safely in. We think the preponderance of the evidence justifies the conclusion that the Garden City rounded in for making the entrance into the canal in a proper way, and that when she reached the range she held onto it going at full speed, as she ought to have done, and that she gave the signal to her barges to straighten up as soon as their situation showed the necessity for it. Besides, the testimony from the King shows that her officers were fully alive to her difficulty.

Little need be said in regard to the contention that the steamer, on realizing that she could not get her tow into the canal, should have then turned for Keweenaw Point. Assuming that she might have taken that course at one time, there was nothing to induce serious apprehension of disaster until it was imminent, and then the only chance was to go ahead. She failed by only a few feet, and we are satisfied she would not have failed but for the faults of the barges, for which she was not responsible.

What we have said in regard to the conduct of the vessels after turning in to make the entrance has primary reference to the bearing which the result of the endeavor has upon the wisdom of the choice of the master in seeking the ship canal rather than going around Keweenaw Point. But we have had in mind that the appeal brings up the whole case, and that we may possibly be mistaken in our inference that the appellees plant their case entirely upon the allegation of fault on the part of the steamer in not taking the course around Keweenaw Point, and have therefore given the reasons for our opinion that, upon the whole record, there is no just foundation for imputing negligent seamanship to the steamer. We have no disposition to relax the obligations of steamers and tugs who undertake the duties of towing other vessels, but it would be unjust to charge the steamer with a fault which rests on grounds not substantiated by the proof. Our opinion is that it is not shown that the Garden City did not discharge her duty with that reasonable degree of skill and prudence which the law required of her; that is to say, such a measure as is generally bestowed in the practice of good seamanship.

This conclusion disposes also of the appeal of the libelants.

The decree of the District Court is reversed, with direction to dismiss the libel, with costs in the District Court and in this court.