## THE LIZZIE D. SHAW.

## THE RITA DEMPSEY.

## SHAW et al. v. DEMPSEY SONS BARGE CO.

### No. 4491.

Circuit Court of Appeals, Third Circuit.
March 3, 1931.

Rehearing Denied March 24, 1931.

Lewis, Adler & Laws, of Philadelphia, Pa. (Francis S. Laws, of Philadelphia, Pa., of counsel), for appellants.

Samuel B. Fortenbaugh, Jr., J. T. Manning, Jr., and Acker, Manning & Brown, all of Philadelphia, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

The owners of the Barge "Rita Dempsey" filed a libel in rem against the Tug "Lizzie D. Shaw" to recover damages sustained by the "Dempsey" in a collision between that barge and two other barges while she was in tow of the "Shaw." From an interlocutory decree sustaining the libel the claimant of the tug appealed.

Though presented as one action with related parts, there really were four distinct phases of this occurrence in each of which a separate act of negligence is charged against the tug. It may be helpful if first we give the voyage in outline.

(a) The tug "Shaw" with the barges "Ella V. Camp" and "Rita Dempsey" in tow, tandem, bound from Philadelphia to Baltimore, entered the eastern end of the Delaware and Chesapeake Canal early one morning. The tug and tow had proceeded without incident for about ten miles when, turning a sharp bend, the tug's master saw two barges stranded about a quarter of a mile ahead. They were the "Annie McNally" and "Richard Diggs" with their tug, the "Columbia," standing by. That was the end of the first phase and the beginning of the second.

(b) The master of the "Shaw" took certain precautionary measures but the tug and "Camp" grounded in an attempt to pass the stranded barges, causing the "Dempsey" to collide with the "Diggs" and the "Camp" and, in consequence, to suffer damages which made her leak. That was the second phase.

(c) The "Shaw" got herself free and with the assistance of the "Columbia" succeeded in moving the "Camp" past the stranded barges. She took her out of the canal at its western end and, anchoring her in Back Creek, returned to the scene of the accident. The "Shaw" then assisted the "Columbia" to float her stranded tow. Hooking up the "Dempsey" with the "McNally" and the "Diggs," the tugs together moved the combined tow to Back Creek. That was the third phase.

(d) The fourth phase of the occurrence consisted in the action of the two tugs picking up the "Camp" in Back Creek, assembling the four barges, reforming the tow and, still together, starting for Baltimore late that night. Early the next morning while in the Chesapeake Bay, the "Dempsey" began to settle. The tugs hastened her into shoal water where she sank. Later she was raised and moved to Baltimore.

In order to determine the character of the action and avoid some difficulties that crept into the trial, we turn for a moment to the libel. There the owners of the barge aver a contract of towage with the respondent tug owner to the effect that, either for the "Camp's" safety or to avoid scratching her newly painted hull, each barge should be taken through the canal separately. Though averring such a contract and its breach, the libel clearly sounds in tort. The learned trial judge did not find a contract for the evidence does not prove one, but regarded the discussion between the parties in respect to the single towage of the "Camp" as acquainting the tug owner with the risk of towing a barge of her size and draft otherwise than alone. As this holding does not involve the question of a contract we shall look upon the action as in tort and the tug's liability one for negligent towage founded on the duty imposed by law and independent of any contract made or consideration paid for the towage. The Temple Emery (D. C.) 122 F. 180; The John G.

Stevens, 170 U. S. 113, 124, 18 S. Ct. 544, 42 L. Ed. 969; Southgate v. Eastern Transp. Co. (C. C. A.) 21 F. (2d) 47, 49.

Preliminary to a discussion of the facts and particularly pertinent to much that happened, the water conditions which confront all craft entering the Delaware and Chesapeake Canal must be understood. The canal is about thirteen miles long. It is a sea-level canal, its eastern end opening into the Delaware River near the head of the Delaware Bay and its western end into Back Creek near the Chesapeake Bay, both bays being great tidal bodies of water. When the tide is flood the waters of the two bays enter the canal at opposite ends and the tide from the Delaware meets the opposing tide from the Chesapeake about midway the canal at Larwood Grove seven miles from the eastern end, and there both stop. When the tide turns to ebb two currents start from Larwood Grove, one easterly toward the Delaware and the other westerly toward the Chesapeake. So it happens that Larwood Grove is the center of this tidal peculiarity at which the water, except when slack, is always running in opposite directions. Moreover, these currents of opposite movements start at a slow pace when the tide is slack, whether at flood or ebb, and quickly picking up speed rise to about four knots and sometimes five knots an hour, described by canalmen as a "mill race." This condition has to be reckoned with by all intending to traverse this artificial waterway.

(a) The master of the tug "Shaw," a mariner long experienced in towing through the canal, knew of these water conditions. To avoid the worst of them and take advantage of the best of them he purposely waited several hours outside the canal with his tow until the tide was nearly high and running about one and one-half miles an hour. Desiring to go in with the flood to Larwood Grove and then, on the change, go out with the ebb from Larwood Grove and thus avoid breasting the swift current anywhere, he entered the canal with the two barges in tow, first the "Camp," a large barge of deep draft, and next the "Dempsey," a small partly laden barge of lesser draft. The weather was fair and the wind light but there was a very full tide because of previous wind conditions. The "Shaw" with her tow proceeded on the rising tide nearly to Larwood Grove where she caught the change of tide and thereafter proceeded on the falling tide toward the western end of the canal. When she reached Goose Point the current was running from three and one-half to four miles an hour and the tug and tow were moving at a speed of half a mile greater to maintain steerage way. It was here she turned a bend in the canal with high banks on both sides and first saw and learned of the stranded barges ahead.

The libellants maintain, and, as we understand, the court held, that negligence lay in commencing the voyage as it was undertaken. This involves (1) taking a barge of the size of the "Camp" through the canal at all, (2) taking her with another barge, tandem, (3) in view of known water conditions, and (4) the duty of the tug's master to anticipate overtaking and meeting another tow and the risk of passing in a narrow channel. Of course, if the master had known of the stranded barges or was charged with anticipating their presence blocking the canal, the situation would have been different, but here the disaster which befell the "Dempsey" supplies the knowledge that comes after the event. It does not necessarily impeach the judgment of the master who decided previously that it was safe to start on the voyage through the canal with the two barges in tow, tandem. He can not be charged with negligence for entering the canal with a tow of this character unless he made a decision which nautical experience and good seamanship would condemn as inexpedient and unjustifiable at the time and under the circumstances. The Nannie Lamberton (C. C. A.) 85 F. 983; The Eastern (C. C. A.) 280 F. 711, 713.

Briefly, we find from the evidence that it was customary to tow barges of the size of the "Camp" through the canal, singly and with another. We cannot hold as matter of law that towing one large barge or two barges, one large and one small, in the Delaware and Chesapeake Canal, a public waterway, publicly maintained and operated for craft of their size, is, notwithstanding its exacting water conditions, negligence. And, finally we hold that while the master of the tug assumed the risks and was chargeable with knowledge of all normal conditions, especially those of meeting and passing other craft in this two-way waterway, he was not chargeable with knowledge of the stranded barges or with the duty of anticipating a disaster of that kind and making up and starting his tow accordingly. The accident happened by reason of an unknown abnormal condition.

(b) Turning a bend, the master of the tug saw the stranded barges a quarter of a mile ahead practically blocking the canal. His tug and tow were moving on a four mile current in the direction of the barges. He

had to do something and do it quickly. Reckoning from speed of current and distance to go, he had about four minutes in which to do it. This was the situation that confronted him. He was also confronted by the law which, whether he knew it or not, required of him the exercise of reasonable care and skill in the circumstances else his owner's boat would be liable for the consequences. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The W. H. Simpson (C. C. A.) 80 F. 153, 154; The Atlantic City (C. C. A.) 241 F. 62, 64.

What could he do? He could not anchor either barge for fear the chain would rip her bottom because of the drag of the current; he could not tie them up, for there were no places on the bank at which to tie up; he could not take them back through the canal because the "Camp" was too long to turn in the narrow waterway. Seemingly, there was only one thing he could do, which was to go ahead. What, actually, did he do?

Recognizing the rapid current as the major maneuvering factor in the situation, the master of the "Shaw" promptly stopped her engines, shortened the line leading to the "Dempsey," took in the line leading to the "Camp," dropped the tug back, made her fast to the starboard side of the "Camp" and reversed her engines so as to work against the current and in that way slow up the tow and make its impending impact with the stranded barges as light as possible. As he got closer, however, the master saw that one barge, the "McNally," was afloat in the southerly or deeper part of the channel yet blocking it completely, and next to her in mid-channel was the stranded "Diggs," and that between her starboard side and the northern shore there was open water through which he thought the tow might safely pass. The space was narrow and the depth unknown. And so he steered for this opening with the intention of easing by. The boats were then going very slowly. On entering it both the "Camp" and the tug stranded. The "Dempsey," however, continued going on with the tide and nosed her bow in between the stern of the "Camp" and the stern of the "Diggs" without suffering damage. Thus pivoted, the rapid current caught her stern and swung it across the canal into the northern bank, partially tearing off her rudder and twisting her skag which caused her to take in water.

■ In all this the libellants charge negligence. What should the "Shaw" have done in the few minutes between sighting and hitting the stranded barges? The libellants have not answered this question satisfactorily. To prevail they must answer it, for this is the central phase of the controversy and the burden of proving negligence—the violation of some duty—is upon those who seek to charge the tug with liability. The Atlantic City (C. C. A.) 241 F. 62, 64. The happening of the accident does not raise any presumption of negligence on the part of the tug. She is not an insurer of the safety of the tow. Southgate v. Eastern Transp. Co. (C. C. A.) 21 F.(2d) 47, 49; The Margaret, 94 U. S. 494, 497, 24 L. Ed. 146. Moreover, the tug should be exonerated if her master acted, not with the highest degree of skill and care, for that was not required of him, The Margaret, 94 U. S. 494, 497, 24 L. Ed. 146, but with reasonable skill and care and in the exercise of the reasonable discretion of experienced navigators. The Nannie Lamberton (C. C. A.) 85 F. 983; The Eastern (C. C. A.) 280 F. 711, 713.

■ Here was a marine situation in which according to the libellants the "Shaw" should not have gone on and according to the circumstances she could not stop. Even if she could have stopped, she would have done so at the risk—almost the certainty—of her tow becoming snarled with the other tow and increasing the blockade. The master saw one way out, namely, to pass the stranded "Diggs" in the narrow space of doubtful depth between her starboard side and the northern bank. In taking the chance he is not to be charged with negligence unless he made a decision which in the circumstances nautical experience and good seamanship would condemn. The result of the decision is not the test of liability. The Garden City (C. C. A.) 127 F. 298, 300; The Eastern (C. C. A.) 280 F. 711, 713.

■ The "Shaw's" attempt to pass the "Diggs," if not compulsory, was a feasible maneuver as will presently be seen. We hold it was in the circumstances not unseamanlike, and, therefore, not negligent.

(c) The tug worked herself free and with the assistance of the "Columbia" moved the "Camp" past the stranded barge. Thus it appears that the space between the "Diggs" and the northern shore was almost wide enough and deep enough to get the "Camp" through in the original maneuver.

The tug then took the "Camp" out of the canal and anchored her in Back Creek. Returning to the scene of the accident, her master found that during her absence the tide had turned to flood and the current, then going strongly in the opposite direction, had turned

the bow of the "Dempsey" up-stream with her stern ashore as a pivot, doing her more damage. Later she swung out in the channel, pointing in the wrong direction.

As this is a government canal with heavy marine traffic governed by United States Rules of Navigation, it was absolutely necessary to relieve the canal of this double blockade as promptly as possible and also to prevent the "Dempsey" sinking in the canal. So the two tugs first set about to float the "Diggs," in which they succeeded. Then the "Shaw" tried to turn the "Dempsey" but failed. Whereupon they made up a new tow —the tugs leading—with the "McNally" and "Diggs" abreast and the "Dempsey," stern foremost, fastened to their sterns by two short lines. After proceeding in this fashion some distance the "Diggs" smelled the bottom which checked her movement. The "Dempsey," of course, continued to go on and, as the next chapter in this fatality of accidents, her stern came up under the stern of the "Diggs," breaking one of the "Dempsey's" bitts and starting the planks in her already injured stern. After this nothing happened until the flotilla reached the anchored "Camp" in Back Creek.

■■■ Unless towing the "Dempsey" stern foremost was bad seamanship, the "Shaw" is not liable for this later accident. Towing her in this way was made necessary by the fact that her rudder was jammed athwart her stern and an attempt to tow her bow foremost would cause her to cut and sheer from one side of the canal to the other—yaw "all over the canal"—a thing to be avoided not only for the safety of the other barges in the tow but for the safety of passing craft.

We find from the evidence that this was not an improper and therefore not a negligent way of towing a barge in her condition.

■■■ (d) The tugs and tow arrived at the Back Creek anchorage late at night. The decision as to what should be done—whether to anchor the "Dempsey" and push on without her or take her to Baltimore—rested wholly with the master of the "Shaw." The silence of the master of the barge, urged by the respondents as denoting his acquiescence and that of the barge owners in what later was done, is of no legal consequence. The duty of the master of the tug to decide and the responsibility for his decision remained with him. In coming to a decision the master of the tug knew or was charged with knowledge of the "Dempsey's" condition as to her sea-worthiness for such a trip. What was her condition?

In discovering immediately after the first accident her twisted skag and loosened planks, the master of the "Dempsey" set her gasoline pumps at work and kept them going for a time. When the "Shaw" returned from her outward trip with the "Camp," the tide had risen and shortly thereafter the "Dempsey" was afloat. Though making water, her master (at a time that is not certain) stopped the pumps and did not start them again during the balance of the run in the canal and during the whole of the run in Back Creek, explaining that they were not needed until the barge got "outside," in the Chesapeake Bay.

At any rate the master of the "Shaw" knew at the "Camp" anchorage that the "Dempsey" showed 22 to 24 inches of water, of which 6 to 9 inches had been taken in during an hour's run and he knew the leaky condition of her stern.

On the other hand the "Columbia" was equipped with a four inch siphon. Her master was willing to hook up his tow with that of the "Shaw" and accompany them to Baltimore, ready to give aid to the "Dempsey" in case her water increased.

Here was a problem confronting the "Shaw's" master. Was the "Dempsey's" condition such as to require that she be left at anchor in Back Creek? (No one at that time thought of beaching her.) In such case she would be deprived of the "Columbia's" siphon, for that tug had to go on with her own tow, and the "Dempsey" would be left alone to float or sink. Or, was her condition such as to justify pushing on to Baltimore with the assistance of the "Columbia's" siphon if needed?

The master of the "Shaw" decided to go on. The tugs' combined tows were reformed again, this time with the "Shaw" ahead and the "Columbia" alongside the "Dempsey" to aid her in steering and keeping her water down.

When the flotilla got outside, the "Dempsey" started her gasoline pumps and the "Columbia" put her siphon in her and set it at work. The master of the "Columbia," believing "there wasn't any question that we would soon blow the water out of her," turned in with instructions to his mate to call him "when the siphon blowed." Early next morning the "Dempsey" began to settle and she settled so rapidly that the tugs cut her out of the tow and grounded her in shallow water.

The master of the "Shaw" cannot be held at fault simply because of the disaster. The Garden City (C. C. A.) 127 F. 298, 300; The Eastern (C. C. A.) 280 F. 711, 713. The fault, if any, must be found in his judgment; and his judgment must be appraised in the light of the circumstances, including the condition of the barge and what measures could feasibly be taken for her safety; and the circumstances must show, on the libellants' affirmative proof of negligence, what the master should have done and that he failed to do it. Certainly the evidence does not admit of a finding that he should have left the leaking "Dempsey" at anchor in Back Creek without help except from her own pumps. Nor does it permit us to find that, in deciding to push on with the assistance of the "Columbia" he displayed such bad judgment as would amount to negligence. The E. Luckenbach (C. C. A.) 113 F. 1017, 1018. No one, qualified in nautical matters, testified that his judgment was bad. There is testimony that his judgment was good. On the evidence, the libellants have failed to prove negligence.

The decree is reversed, with direction that the libel be dismissed and the respondents be allowed their costs.