## SCHUYLKILL TRANSP. CO. v. BANKS et al. (PUBLIC SERVICE ELECTRIC & GAS CO., Intervener).

## PUBLIC SERVICE ELECTRIC & GAS CO. v. DELAWARE RIVER LIGHTERAGE CO.

## THE BARGE NO. 563.

## THE GRACE ANN.
### No. 51 of 1943; No. 3 of 1944.

District Court, E. D. Pennsylvania.

Aug. 3, 1944.

Shields, Clark, Brown & McCown, by Samuel B. Fortenbaugh, Jr., all of Philadelphia, Pa., for Schuylkill Transp. Co.

Conlen, LaBrum & Beechwood, by George E. Beechwood, all of Philadelphia, Pa., and Bigham, Englar, Jones & Houston, by Charles A. VanHagen, Jr., all of New York City, for Public Service Electric & Gas Co.

Howard M. Long, of Philadelphia, Pa., for Chas. T. Banks et al. and the Grace Ann.

BARD, District Judge.

This case involves two actions in admiralty which were by agreement consolidated for purposes of trial. No. 51 of 1943 is an action by Schuylkill Transportation Company (hereinafter called Schuylkill) as owner of Coal Boat No. 563, and as bailee of a cargo of coal laden thereon, against Charles T. Banks and Flo L. Banks, individually and trading as Charles T. Banks Towing Line (hereinafter referred to as Banks) and the Tug "Grace Ann," her engines, etc., to recover damages for the sinking of the barge "563" while being towed by the respondents' Tug "Grace Ann," allegedly as a result of the negligence of the tug. No. 3 of 1944 is an action by Public Service Electric and Gas Company as owner of a cargo of coal laden on the "563" when she was sunk, against Delaware River Lighterage Company, the Schuylkill Transportation Company and others to recover the value of the cargo. Public Service Electric and Gas Company, as owner of the cargo, also filed a petition to intervene in No. 51 of 1943, and it was stipulated by the parties that this intervention be allowed. It was further agreed that the question of damages be postponed pending determination of liability.

I make the following special

### Findings of Fact:

1. On the morning of April 19, 1943, Banks orally contracted with Schuylkill to supply a tow boat to tow barges Nos. "574" and "563" from Pier No. 18, Philadelphia, up the Delaware River to Burlington, New Jersey.

2. Thte "574" and "563" were wooden barges each laden with a cargo of coal.

3. Barge No. 563 has a square bow and stern, measures 110 by 32 by 17 feet, and is open-hatched and has hatch coamings of a height of 3 feet 6 inches.

4. At about 11 A. M. on April 19, 1943, Banks' tug "Grace Ann" took the barges in tow and began the trip to Burlington.

5. The "574" was fastened to the "Grace Ann" with a 6 inch hawser, and the "563" was fastened to the after section of the "574" with a short line.

6. At the beginning of the voyage the "563" had freeboard of about two feet forward and aft and about eighteen inches amidships.

7. At the start of the voyage and at all times thereafter until the sinking of the "563" the tide was flood, there was a strong wind blowing from an easterly direction at a velocity in excess of 25 miles per hour, and it was raining.

8. The flotilla proceeded up the Delaware River without serious difficulty into the wind and seas until a point just north of the Tacony-Palmyra Bridge.

9. Just north of the Tacony-Palmyra Bridge the course of the Delaware River turns eastward about a point and a half.

10. Almost immediately after the flotilla went to starboard through this change of course the "563" began to list and shortly thereafter the river came over her and she went broadside and promptly sank.

11. The cargo of coal aboard the "563" when she sank was the property of Public Service Electric and Gas Company, which had contracted with the Delaware River Lighterage Company, one of the respondents in action No. 3 of 1944, for the transfer of the coal from Philadelphia to Burlington, New Jersey, pursuant to which contract the Delaware River Lighterage Company had supplied Barge No. 563, owned by Schuylkill on April 19, 1943.

12. The sinking of Coal Boat No. 563 was caused by the negligence of the "Grace Ann" in proceeding on its course up the Delaware River north of the Tacony-Palmyra Bridge under existing weather and tide conditions.

### Discussion.

On April 19, 1943, in the early morning, 883 long tons of coal were laden on coal barge "563" at her berth on the port side of Pier 18, Philadelphia. Pursuant to an agreement made that morning between Schuylkill and Banks, the Tug "Grace Ann", which was owned by Banks, came to the dock and took in tow the "563" and also Coal Barge No. 574, which was a similarly constructed barge likewise laden with a cargo of coal. After towing the barges out into the river, the "Grace Ann" fastened a single hawser to the center bow cleat of the "574" and the "563" was made fast to the after section of the "574" by short lines. The "563" had freeboard of approximately two feet at the bow and stern and about eighteen inches amidships.

At the start of the voyage the tide was full flood and it was raining. There was a wind blowing from an easterly direction at a velocity of 25 miles per hour or more. As the trip proceeded, the weather and tide continued the same except for some increase in the velocity of the wind. The barges took some spray over their bows and shipped some water, but were not in serious distress until the flotilla passed the Tacony-Palmyra Bridge, shortly north of which the course of the river turns eastward about a point and a half. Until then the flotilla was headed into the wind and seas. Almost immediately after the change of course which caused the wind and tide to be opposed the "563" was in distress. Within several hundred yards of the bridge, the "563," in the words of her captain, "swung sideways and one sea came up and held her down, and another one came and held her down, and another one came over the top and she turned over." To save the "574," the lines were cut just before the "563" sank. The "Grace Ann" continued on the trip and successfully towed the "574" to her destination.

This case presents the familiar controversy between the owner of a tug and the owner of a barge when a loss has occurred. The barge contends that the loss resulted from negligence on the part of the tug, and the tug counters with the charge that the loss was the result of the unseaworthy condition of the barge.

The duty of a tug to her tow has been frequently considered by the authorities. It is well established that the tug is not an insurer of the safety of her tow, but is bound to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Lizzie D. Shaw, 3 Cir., 47 F.2d 820; The Clarence L. Blakeslee, 2 Cir., 243 F. 365; The Atlantic City, 4 Cir., 241 F. 62; Delaware Dredging Co. v. Graham (The J. D. Graham), D. C., 43 F.2d 852. The burden of proving failure to exercise such care is on the libellant and unexplained damage to or sinking of the tow is insufficient to meet this burden. Stevens v. The White City, supra; The Lizzie D. Shaw, supra; The Atlantic City, su-

pra; Delaware Dredging Co. v. Graham (The J. D. Graham), supra.

Has the libellant Schuylkill met this burden? To the numerous charges of negligence urged by it, only those centering about the hazards to which the "Grace Ann" subjected the "563," by continuing the voyage despite the extremely adverse weather conditions, and particularly by continuing beyond the Tacony-Palmyra Bridge, where the course of the Delaware River turns in an eastward direction, find material support in the evidence. There is no dispute that the "563" was not in serious difficulty before this change of course and that she began to list almost immediately thereafter and sank within a short period of time. The suddenness of the catastrophe which befell the "563" substantially eliminates the decayed hatch coamings (the extent of which decay was the subject of a great deal of evidence) as the effective cause of her sinking. The ultimate question, therefore, resolves itself to whether the master of the "Grace Ann" should have realized as a prudent navigator that this change of course under prevailing conditions involved the danger to the tow which subsequently materialized.

I am of the opinion that this question should be resolved in favor of the barge. In addition to the rapidity with which she sank following the change of course, there is further evidence which indicates that the tug was guilty of more than a mere error in judgment. Captain Hudson, an experienced tug captain, was on the river the day of the accident and decided against going north of the Tacony-Palmyra Bridge and encountering a side sea. While it is true that the nature of his tows may limit somewhat the significance of his decision in this respect, he further testified that in his opinion as an expert the "Grace Ann" should not have undertaken the tow and venture the change of course north of the bridge under existing weather and tide conditions. His opinion in this respect was corroborated by another experienced tug captain who was on the river that same day. The evidence is undisputed that the tide was full flood and that a very strong wind was blowing in an easterly direction. Until the change of course the flotilla was proceeding directly into the wind and seas, but upon the change of course the wind was a little to the quarter, which resulted in much rougher and more dangerous seas. These condi-

tions were observed and their dangers recognized by other experienced tug captains and they should have been anticipated by the "Grace Ann."

The authorities announcing the broad principles according to which the liability of a tug to her tow is determined have been cited above. These principles have been applied to hold the tug liable in the two cases presenting facts most analogous to those in the case at bar. In The Katie E., D.C., 46 F.2d 534, a tug was held guilty of negligence in proceeding into waters where the tide was obliquely opposed to the wind without sending an accompanying tug ahead to determine whether it was safe to proceed. Said the Court at page 535 of 46 F.2d: "There is no dispute in the testimony that this barge was not in difficulty until after the turning movement which brought her to the weather side of the tow where it was exposed to the full effect of the wind and waves; in other words, while she occupied a lee berth in the tow, she was protected, and gave no trouble." And again, 46 F.2d at page 536: "Knowing the condition of the tide, which was obliquely opposed to the wind, it seems fair to hold that the precaution should have been taken of sending the Ashbourne ahead to observe and report upon conditions in the bay, as was suggested by Judge Brown in The Nannie Lamberton, D.C., 79 F. 121, under almost identical circumstances. Had this been done, it may be doubted if the tow would have left the Kills that night. The decision for the libelant barges by Judge Brown was affirmed in [2 Cir.] 85 F. 983, and it would seem that to reach a different result in this case would be to disregard decisions which are of compelling authority."

On similar facts the same result was reached in The Nannie Lamberton, D.C., 79 F. 121, affirmed 2 Cir., 85 F. 983, referred to in the above quotation.

In view of my conclusion that it was the negligence of the tug which was responsible for the loss of the barge and her cargo, the "Grace Ann" and her owner are responsible to Schuylkill for the damage to Coal Boat No. 563, and to the intervener, Public Service Electric and Gas Company, for the value of the cargo thereon.

I make the following

## Conclusions of Law:

**1.** The sinking of Coal Boat No. 563 was caused by the negligence of the "Grace

Ann" in proceeding on its course up the Delaware River north of the Tacony-Palmyra Bridge under existing weather and tide conditions.

2. In case No. 51 of 1943, respondents Charles T. Banks and Flo L. Banks, individually and trading as Charles T. Banks Towing Line, and Tug "Grace Ann," her engines, boilers, apparel, tackle, furniture, etc., are liable to libellant, Schuylkill Transportation Company for the damage to the barge "563."

3. In case No. 51 of 1943, respondents Charles T. Banks and Flo L. Banks, individually and trading as Charles T. Banks Towing Line, and Tug "Grace Ann," her engines, boilers, apparel, tackle, furniture, etc., are liable to the intervener, Public Service Electric and Gas Company, for the value of its cargo lost upon the sinking of the "563."

4. In case No. 3 of 1944, the libel is dismissed.

Decrees may be submitted.