### SCHOONMAKER CONNERS CO., Inc., v. LAMBERT TRANSP. CO. et al.

(Circuit Court of Appeals, Second Circuit. July 3, 1920.)

No. 206.

1. **Shipping ☞58(2)—Charterer by demise prima facie liable for damage to scow.**

   Where a scow without motive power, demised to a charterer, was received in good condition and was to be returned in like condition, but was returned in bad condition, it is incumbent on the charterer to show (1) how the damage occurred, and (2) that it was not caused through its negligence, or through the negligence of any one to whom it had intrusted the boat.

2. **Shipping ☞54—In absence of covenant to return in good condition, charterer liable only for negligence.**

   Where a charter party contains no covenant for the return of the vessel in good order and condition, there is no liability for injury to the vessel without proof of negligence.

3. **Shipping ☞58(2)—Negligence of charterer, causing damage to scow, shown by evidence.**

   A finding that damage to a scow was caused by negligence of a subcharterer *held* sustained by evidence showing that it placed 1,200 drums of caustic soda on the scow's deck, where it remained uncovered for 50 days, that under such conditions some of the soda would leak from the drums, that the deck and sides of the scow were eaten and decayed, and that similar effects on wood had previously resulted from like cause.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Schoonmaker Conners Company, Incorporated, against the Lambert Transportation Company, with the Acme Steamship Corporation, impleaded. Decree for libelant against both respondents, and the Acme Steamship Corporation appeals. Affirmed.

The libelant and respondent are corporations organized and existing under the laws of the state of New York and having their respective offices in the city of New York. On December 24, 1917, the libelant chartered to respondent its scow, Kaaterskill No. 4, which at the time is alleged to have been tight,

staunch, and strong and in every respect seaworthy. The charter was to commence on December 25, 1917, and was to continue until the scow was returned to libelant in the towing limits of New York Harbor, at a place designated by libelant, in the same condition as when she 'entered upon the charter, less ordinary wear and tear. The rate to be paid by respondent for the use of the scow was $12 per day. The libel contains, among others, the following allegations:

"Seventh. That the said scow Kaaterskill No. 4 was a boat without motive power, and the charter of the said scow by the libelant to the respondent amounted in law to a demise of said scow to the respondent.

"Eighth. That the respondent failed and neglected to return the said boat to the libelant in the same condition as when she entered upon the said charter, less ordinary wear and tear, but loaded or caused and allowed the said vessel to be loaded with a cargo of caustic acid, which was a dangerous cargo, and a cargo likely to cause damage by eating away the structure of said scow, despite the protest of the libelant, made to the respondent at the time.

"Ninth. That thereafter, and on or about April 11, 1918, the respondent returned the said scow to the libelant in a damaged condition, owing to the loading and carrying of the said cargo, and failed and neglected to return the said boat in the same condition as when delivered to the respondent, less ordinary wear and tear.

"Tenth. That the said damage to said boat was not caused by ordinary wear and tear.

"Eleventh. That by reason of the premises, the libelant has been damaged in the making of the repairs, towing, survey fees, demurrage, etc., in approximately the sum of five thousand ($5,000.00) dollars."

The answer denied the allegations contained in all the above paragraphs, except the seventh, which it admitted.

The Lambert Transportation Company, Incorporated, having answered, then filed a petition, in which it declared that it had chartered the scow Kaaterskill No. 4 to the Acme Steamship Corporation, and that the latter had used the said scow and had loaded the same with a cargo of caustic acid, and had failed to cover the cargo, and failed to take the ordinary precautions in handling the acid, and in fact had used the scow for the purpose of lightering caustic acid in the face of the protests of the petitioner; and it further alleged that any damage done to the scow as alleged in the libel was caused, not by the petitioner, but by the fault, neglect, and carelessness of the Acme Steamship Corporation. It prayed that the latter might be cited to appear and answer on oath, and be held solely liable for any damage that had been caused to the Kaaterskill.

The Acme Steamship Corporation, being thus impleaded, filed an answer, in which it denied the various allegations contained in the libel, admitting, however, that the scow was a boat without motor power. The court below has entered a decree against the Acme Steamship Corporation and the Lambert Transportation Company, with process first against the Acme Steamship Corporation, and if they should not respond, against the Lambert Transportation Company. The final decree, including interest and cost as taxed, is in the sum of $5,072.89.

Alexander S. Bacon, of New York City (Charles Podsenick, of New York City, of counsel), for respondent appellant.

Macklin, Brown, Purdy & Van Wyck, of New York City (William F. Purdy, of New York City, of counsel), for libelant appellee.

Edward Brown, of New York City, for respondent appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above).    [1] It appears, and indeed is conceded, that when the Kaaterskill was char-

tered to the Lambert Transportation Company, respondent herein, she was in good condition, and that when the boat was returned she was in bad condition. It was therefore incumbent upon the aforesaid respondent to show: (1) How the damage occurred; and (2) that it was not caused through its negligence, or through the negligence of any one to whom the respondent had intrusted the boat. White v. Upper Hudson Stone Co., 248 Fed. 893, 160 C. C. A. 651; Terry & Trench v. Merritt & Chapman Derrick & Wrecking Co., 168 Fed. 533, 93 C. C. A. 613.

That the libelant is entitled to a decree is admitted by the Lambert Transportation Company, Incorporated, the respondent. The real matter in issue, therefore, is as to the liability of the Acme Steamship Corporation, which is impleaded. It is admitted that, when the scow was returned to the libelant, she was not only not in the same condition she was in when she was taken over, but that she was indeed in a very bad condition. As the charter party contained a covenant wherein it was agreed that the scow was to be returned in like condition as on delivery, reasonable wear and tear excepted, the liability of the respondent is of course beyond any question.

[2] The difficulty in the case arises over the relation of the Acme Steamship Corporation to the matter, and is due to the fact that, after the respondent took over the scow under its charter with the libelant, it in turn subchartered her to the Acme Steamship Corporation, and in doing so failed through carelessness to exact of the latter a covenant for the return of the boat in the same condition as she was in on delivery, reasonable wear and tear excepted. It is settled law that, where a charter party contains no covenant for the return of a vessel in good order and condition, there is no liability for injury to the vessel without proof of negligence. C. F. Harms Co. v. Upper Hudson Stone Co., 234 Fed. 859, 148 C. C. A. 457. The liability of a charterer depends upon the terms of the charter party, and if the injuries complained of are not within the terms of the charter party then liability will turn upon whether the damages are attributable to the charterer's negligence. Worrall v. Davis Coal & Coke Co., 122 Fed. 436, 58 C. C. A. 418; W. H. Beard Dredging Co. v. Hughes (D. C.) 133 Fed. 680.

[3] In determining the question of negligence it becomes necessary to examine into the facts as they are disclosed upon the record. When the boat was chartered to the Lambert Transportation Company she was, as we have said, in good condition; and the record discloses that she was in good condition when the Lambert Transportation Company subchartered her to the Acme Steamship Corporation. When she was returned by the latter, her decks had been eaten away and badly damaged. The court below found that the damage was caused by the negligence of the Acme Transportation Corporation in loading a cargo of caustic soda upon the boat and leaving the cargo uncovered in the rain and weather, so that the rain, by dissolving some of the cargo, which leaked from the drums in which it was contained, produced a chemical change upon the resinous material in the planking of the deck of the boat, causing the condition complained of. But this condition was not confined to the deck. The same character of injury which appeared on

the deck appeared also on her sides and to a lesser extent on her bottom and along inside the skin of the barge. There had been placed on the deck 1,200 drums of caustic soda, and some of these drums had been there for a period of 50 days, exposed to the rain and snow.

There is a conflict in the testimony. The vice president of the Acme Company, who stated that he had been engaged in dealing in woods for 34 years, and who had owned, built, bought, and sold scows, and who saw the deck of the Kaaterskill before and after she was loaded with the caustic soda, and who was asked what the condition of the deck was after the caustic soda was removed, answered that he saw no change in its condition. The following are excerpts from his testimony:

"Q. Have you had any experience with caustic soda? A. Yes sir.

"Q. What was it? A. For the last four years I've been handling general cargo to Italy and French ports, but principally to Italian ports, and I've handled 15,000 drums approximately of caustic soda, probably as many as 20,000 drums.

"Q. What was the effect of the caustic soda on the ships, or on wood?

"Mr. Hull: I object to that. (Objection sustained.)

"Q. What did you actually see? A. I have handled it on the dock and on open barges. I have had it stored on the wooden dock for as long as 7 months at a time. The caustic soda would sometimes get out of the drums, by reason of the holes being in the drum—hooks where the stevedores stick them in the side of the drum, and caused a little to come out—and that would get on the wood. I had it for 7 months on Pier 63, North River, on the wood, and no hurt to it at all.

"Q. What was the wood on Pier 63? A. Pine.

"Q. What was the effect of the caustic soda on the wood of Pier 63? A. None.

"Q. Was that out, exposed to the air? A. Partly so, and partly not; most of it was uncovered.

"Mr. Hull: Then I ask that the answer be stricken out, because he said it was partly uncovered.

"Witness: Part of it was under cover, where it was under the shedded portion of the dock. (Motion denied.)

"Q. In relation to that part which was exposed, not under cover, how long would it be there at a time? A. It was there as long as 7 months.

"Q. Was it during that time exposed to the rain? A. Right out in the open.

"Q. And part of the caustic soda was out of the drums, out on the wood? A. Yes, sir. And the same on Pier 2, Empire Stores, and we had the same thing over there, 2,300 drums, and part of it was under cover, and where the covered space was filled up we put it right out in the open.

    *        *       *       *       *       *       *       *       *       *       *       *

"Q. Would exposure to water and air alone cause Oregon pine, or yellow pine, to become rotten, to get into sliver? A. The exposure to sun and to water or rain alternately would cause decay to set in very quicky. If the wood was kept wet, and saturated with water at all times, it would not decay at all; but the alternate action of the sun and the water would cause it to decay more rapidly than if kept perfectly dry or perfectly wet.

"Q. Did you ever hear of such a thing as caustic acid? A. I never have."

An analytical consulting chemist, who had worked with caustic soda in the laboratory and inspected and handled it in warehouses and docks for a period of 8 years, testified on behalf of the Acme Steamship Corporation. The following are excerpts from his testimony:

"Q. How is caustic soda usually wrapped? In what container? A. Caustic soda is usually wrapped in iron drums. The drum is made so that it has one

opening, and that is usually closed by a friction top container, like a friction top can. The caustic soda is placed in the drum, where it is fused in the manufacture, and poured into the drum in the fused state, so that after it cools down it becomes one solid mass in the drum.

"Q. That is to say, the caustic soda of commerce, as prepared for transportation, when cooled, is a solid mass inside of this iron drum? A. It is.

   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Q. What is the effect of water upon caustic soda? A. Water will dissolve caustic soda.

"Q. Does it produce an acid? A. No.

"Q. Is there such a thing as caustic acid? A. No.

"Q. Caustic soda is an alkali? A. It is.

"Q. And what is the effect of alkali on acid? A. Alkali neutralizes acid, and forms a salt.

"Q. They are diametrically opposed? A. They are.

   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Q. What is the effect of caustic soda in the presence of water on wood? A. I have never seen it have any effect.

   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Q. Do you know the action of caustic soda, in the presence of water, on wood? A. I have never seen any deleterious effect of caustic soda and water upon wood."

This same witness, however, testified as follows:

"The pine oils, or the pine tars, usually contain a small percentage of rosin. Turpentine is made by the distillation of the sap from the tree, and the residue is rosin, and rosin is approximately 75 per cent. of rosin acids, and they saponify, so that in the pine oil there is usually a small percentage of these rosins, and they are acted upon by the caustic soda, so that there is some action of soda on the oil."

Thereupon the court said:

"You probably are aware of the bearing it has in my mind, but this is the conclusion I am tempted to make from what you say. You have heard the evidence, and you know the contentions of the parties, and I treat you more as an aid of the court than as a partisan witness. It suggests itself to me that, as this caustic soda was on the deck of this boat for a period of nearly 2 months, 50 days, it is very likely that the condition of the deck afterwards was caused by just the reaction you mention, saponification of the resinous acids in the sap of the pine with the caustic soda, because the condition of the deck afterwards seemed to be exactly what might result if the gummy sap had been removed from the surface of the deck. In other words, it pulled loose without any adhesive. Would that be chemically a possible reaction?"

To this question the witness replied:

"That would be possible, assuming that the caustic remained as caustic."

The following excerpt is from the record of what passed between the court and this same witness:

"The Court: If you should suppose that this caustic soda had fallen out, in a small heap, an inch thick, or something of that sort, the part below the bottom would remain caustic soda?

"Witness: It would.

"The Court: And when that was wetted it might, if it lay there, have action on the resinous acids?

"Witness: Yes, sir.

"The Court: And you are not prepared to say that even the sodium carbonate would not also have an action, if long enough prolonged?

"Witness: If long enough prolonged—I am not ready to say anything about that."

A witness called on behalf of the superintendent of the Hunters Point Dry Dock Company, a repair yard in the city of New York, who had 20 years' experience in the repair of barges and scows, and who made the repairs on the Kaaterskill, testified as to her condition as follows:

"I found that the planking was curled up, and sort of strips like, in ribbon pieces, and the pieces we took hold of were very brittle, and the deck had turned a reddish tone in a number of places, and where this acid had run through the scupper hole, down over the side, under the rail, it had burned, or eaten away, on the timbers, so that you could grab some pieces up in your hands into flakes and pieces.

"Q. It had made the timber so that the fiber seemed to be disintegrated? A. As though it had decayed it, just as though it was rotten."

The following is a further excerpt from his testimony:

"Q. Have you, during your experience, had occasion to survey damage upon boats which had carried caustic soda before this one, or since this one? A. Yes, sir.

"Q. Upon how many? A. Two others that I remember.

*    *    *    *    *    *    *    *    *    *    *    *

"Q. Both those boats had carried caustic soda? A. Yes, sir.

"Q. Was there any damage done on those boats? A. Yes, sir. The decks were badly scarred, and the wood was as though it had been decayed, and it seemed as though layers lifted out became brittle.

"Q. Was that in a general way about the same damage you saw on this boat? A. Yes, sir."

The learned District Judge has written a very carefully prepared and discriminating opinion in this case, in which he has reached the conclusion that the damage was caused by the presence of the soda. There is evidence which showed to his satisfaction, and which shows to our satisfaction, that the kind of damage herein complained of had occurred in the past, from a like cause. It was not an unknown injury, although it may have been unknown to the Acme Steamship Corporation. The fact that it was unknown to that company does not absolve from liability, if they were handling a substance which in other instances had caused damages. Within a few days of the time when the scow was turned over to the Acme Steamship Corporation, the latter's attention was called to the dangerous character of the cargo. The libelant notified the Lambert Transportation Company, and that company notified the Acme Company by telephone, and also by letter. The treasurer of the Lambert Company testified:

"Schoonmaker-Conners notified us about a dangerous cargo being on that boat, and immediately I got in touch with Mr. Pendleton and told him that there was caustic soda on there, and it would eat the planks of the tug, and there would be serious damage there unless he covered the cargo. He said he was sending to Twenty-Ninth street, Brooklyn, for cover, and that he would cover up that cargo."

The covers were not put on the cargo, and the Acme Company must answer for the loss occasioned by its negligence. If one having charge of a wooden vessel puts a substance on her deck, which eats the deck up or destroys its strength, such act is negligence. That the Acme Company did put the caustic sode on the deck, and did leave it unprotected from the weather, is not denied.

The court below, having reached the conclusion that the Acme Steamship Corporation was liable in damages for the injuries complained of, referred the matter to a commissioner to ascertain and compute the amount of the damages and report the same to the court. Testimony was accordingly taken, and in due time the commissioner reported, and, no exceptions having been taken thereto, the court confirmed it and entered a decree accordingly. When the matter got into this court on an appeal from the interlocutory and final decrees, the Acme Steamship Corporation complained of the amount of the damages as awarded; but that question we must ignore, as no exceptions had been taken to the commissioner's report.

Decree affirmed.