## THE MONONGAHELA.

### CROWLEY LAUNCH & TUGBOAT CO. v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION et al.

(Circuit Court of Appeals, Ninth Circuit. June 19, 1922.)

No. 3846.

1. Shipping ⟞54—Charterer held not in fault for sinking of barge.

The sinking of a barge after being loaded with no more than the quantity of sand she was chartered to carry *held* not shown by the evidence to have been due to improper loading by the charterer.

2. Shipping ⟞54—In absence of covenant to return in good condition, charterer liable only for negligence.

Where a charter party contains no covenant for return of the vessel in good condition, such covenant cannot be implied, and the charterer is liable for loss or injury only on proof of negligence.

3. Shipping ⟞58(2)—Loss of vessel by charterer; burden of proof.

Failure to return a chartered vessel and her loss while in possession of the charterer makes a prima facie case of negligence; but, when this is met by contradicting evidence, the burden of proof again rests with libelant.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Suit in admiralty by the Crowley Launch & Tugboat Company against the United States Shipping Board Emergency Fleet Corporation and the United States, as owner of the ship Monongahela. Decree for respondents, and libelant appeals. Affirmed.

Thacher & Wright, of San Francisco, Cal. (Thomas A. Thacher and Harrison A. Jones, both of San Francisco, Cal., of counsel), for appellant.

Farnham P. Griffiths and McCutchen, Olney, Willard, Mannon & Greene, all of San Francisco, Cal., for appellees.

---

⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

282 F.—2

Before MORROW and HUNT, Circuit Judges, and BEAN, District Judge.

HUNT, Circuit Judge. Under oral charter Crowley Launch & Tugboat Company furnished to the appellee Shipping Board Corporation a large, flat-framed lighter, Crowley No. 76, for discharging 400 tons of sand ballast from the bark Monongahela in San Francisco Bay. The lighter was made fast to the bark by the employés of the appellant. About the time the barge was fully loaded, she capsized and was lost, and the contention of the appellant is that the loss was due to negligence on the part of the Fleet Corporation in improperly loading and overloading her. The Fleet Corporation denies negligence, and avers that the barge was old and unfit for the service for which she was chartered, and that the loss was due to perils necessarily incident to the service. The lower court found that the evidence did not establish the fact that more sand was loaded on the barge than she was chartered to carry, or that the barge was improperly loaded, and therefore dismissed the libel. Libelant appealed.

[1] There is no dispute as to the general method followed in loading the barge. Stevedores in the hold of the vessel filled buckets attached to a donkey engine, and the engine hoisted the buckets up and dumped them on to the barge. The barge was loaded in four cones or piles, the first cone a little forward of the center. Loading in cones is a very common method, and it satisfactorily appears that those in charge of the loading were experienced in their work. There was a conflict in the evidence as to the number of tons loaded on the barge, but the conflict arises principally by reason of the differing assumptions of fact. Appellant's theory that the barge was overloaded is based upon the number of buckets dumped, which, when multiplied by a specified number of pounds to the bucket, gives a total of over 600 short tons. Naturally, if it were established that the buckets were full, it would be proof of heavy overloading, and appellant should prevail. But the formula adopted is not in accord with the more persuasive evidence. For instance, a witness of long experience, who watched the discharge of the ballast at frequent intervals, testified that, although the buckets were well filled when the dumping first commenced, afterwards, as the sand was taken from the wings and back in the hatch of the Monongahela, many were only half full.

In searching for aid to a right conclusion, we find that the superintendent of the stevedoring company testified that during the loading he was on the dock and on the ship very often, and was obliged to "keep after" the men all the time because they did not fill the buckets. In itself this evidence might be none too reliable; but, when considered with other evidence, it harmonizes with it. Thus the master of the Monongahela testified that, as shown by bills offered, 800 metric tons of sand ballast was paid for and taken aboard at Manila, and that he desired to keep a little more than 400 tons on the ship, and that he so instructed the operators at San Francisco. There is also the testimony of the marine surveyor, who was employed in the discharge of the ballast, whose report shows the draft at each end of the ship, and who

testified that his instructions were that not less than 400 tons should be left on board, and that he gave such instructions to the persons engaged in unloading; that toward the close of the discharge, with others, he calculated the ballast left, using the displacement scale on the ship, and that he found 425 long tons were left on board. The surveyor found the mean draft to be 10 feet 2 inches, 11 feet 8 inches aft, 8 feet 8 inches forward, and, allowing 50 tons for stores and dunnage, he estimated accordingly. At a later time the witness modified his evidence, and gave 525 tons as the correct figure.

A vigorous attack is made upon these calculations, and especially upon the possible error in accepting the displacement scale on the ship. But other marine surveyors placed the dead weight capacity of the ship as 525 tons, where the mean draft was 10 feet 2 inches, and put 50 tons as proper for supplies, stores, and dunnage. There was no valid reason to reject the displacement scale upon which the ship was sent to sea. It may have been placed long before the time of the events now under investigation, but it was none the less proper to permit the witnesses to use it in their calculations, and the District Court was right in so ruling.

We must therefore sustain the view that the quantity of sand put into the barge was less than 400 tons. The sand was piled in the lighter in cones, and when the loading was practically completed there were four large cones and one small one. To obtain even distribution, the barge was shifted from time to time. During the first three of the four days occupied in loading, representatives of the Crowley Company observed the method used, but expressed no disapproval. Men of experience testified that the method of loading in cones, starting in the center, was proper, and, although the Crowley Company introduced some evidence to the effect that flat loading was the more approved way, the general superintendent of the appellant company said that the proper way is to build cones of reasonable height (5 or 6 feet) and "carry it right along and work back again; then you keep your barge in trim and there is no danger."

Appellant also argues that the cones were from 16 to 18 feet in height and were dangerous to the safety of the barge. But the evidence does not warrant such a conclusion, and evidently the representative of the Crowley Company did not disapprove of the method, for he was on the barge on the two days preceding the day of the accident, found her in good condition, and made no comment or suggestion to those in charge of loading. We gather from the testimony that, at about 3:30 in the afternoon of the day the barge was lost, she was level, but that very soon thereafter she leaked and began to list. Mr. Crowley, of the Crowley Company, was on shore and about 4 o'clock happened to observe that the barge was listed, whereupon he made every effort to obtain a centrifugal pump as the best way to relieve the situation; but before the pump could be made effective the barge tilted outward and appeared to buckle, then turned bottom side up and was lost.

Appellant makes the point that, as the barge was held by four lines tight against the ship, there came a very heavy pressure on the out-

ward side of the barge, with the result that the inboard side became jammed against the ship and so caused the collapse, which could have been averted if the lines had been cut. As it is clear that there was no neglect in the way the barge was tied to the ship, the inquiry is narrowed to whether under the exigencies respondent was at fault for not cutting the lines which held the barge. It is certain there was no fault before the listing or leaking, and while it may possibly be that if, after the leaking or listing was discovered, the lines had been cut, the barge could have been saved, on the other hand, it is to be remembered that less than an hour elapsed between the listing and the total loss of the barge.. There was a steam pump and a boiler and there were hand pumps on the barge. The Crowley Company knew of these instrumentalities, but their superintendent, who was on board the barge about 40 minutes before she was lost, and who saw the water coming in through the seams, preferred to await the coming of the centrifugal pump. But, if the pumps had been used, the necessity for use would have been, not because of loading more than the charter allowed, but because of leaking, due, apparently, to the unfitness of the barge to carry the quantity of sand named in the charter.

[2] It is argued that when the barge was chartered to the Shipping Board she was in good condition, and that, having been lost, it was incumbent upon the charterer to show: (1) How the damage occurred; and (2) that it was not caused by its negligence, or the negligence of some one to whom the Shipping Board intrusted the barge. Schoonmaker-Connors Co. v. Lambert Trans. Co. (C. C. A.) 268 Fed. 102, is cited as the last word upon the law. But it is to be observed that, while the court there stated the principle contended·for by appellant, it was applied where there was an express covenant for the return of the vessel in good order and condition. The court was mindful of this, for in another part of the opinion Judge Rogers said that it is settled law that, "where a charter party contains no covenant for the return of a vessel in good order and condition, there is no liability for injury to the vessel without proof of negligence"—citing Harms Co. v. Upper Hudson Stone Co. (C. C. A.) 234 Fed. 859, where it was said that there was no covenant to return in good order and condition, and, the claim for damage being in tort, the charterer could be held only for negligence.

[3] But counsel say that, although in the present case there was no express covenant, such as is referred to, nevertheless it is to be implied, and that the obligations of the parties are to be tested accordingly. But we cannot imply a covenant whereby the relationship became that of insurer and insured, and the case falls within the usual rules of bailment. The Junior (C. C. A.) 279 Fed. 407; Lake Michigan, etc., Co. v. Crosby, 107 Fed. 723; Killam & Co. v. Monad Engineering Co. (D. C.) 216 Fed. 438. Of course, the Shipping Board was obligated to use ordinary and proper care in respect to the barge, and inasmuch as there was a failure to return her to the owners, and she was lost while in the possession of the charterer, proof of those facts made a prima facie case of negligence on the charterer Board. If, therefore,

the charterer had failed to introduce evidence to explain the loss, the Crowley Company would have been entitled to a judgment.

But in the contest, in order to meet the case made by the plaintiff below, defendant went forward with its evidence and endeavored to overcome the force of the prima facie evidence of negligence. Without repeating the details of this evidence, in our judgment it was of sufficient countervailing force to throw back upon the plaintiff the duty of resuming its burden of proving negligence and carrying it to the end of the case. Hastorf Cont. Co. v. Standard Oil Co. (C. C. A.) 272 Fed. 884; Hildebrandt v. Flower Lighterage Co. (D. C.) 277 Fed. 436, affirmed (C. C. A.) 277 Fed. 438; Wigmore on Evidence, § 2483 et seq. True, it cannot be said with entire satisfaction that the board established what was the definite, precise cause for the leaking and capsizing of the barge. Yet there was sufficient evidence for the judge to draw the inference that the charterer was not negligent. It might have been one of several things, or a combination of things. To our minds, the most reasonable view is that the barge, which was old, was not in a condition to sustain the weight of the quantity and kind of cargo for which she was chartered, and the heavy load, though less than 400 tons, caused her to leak, and, once leaking, she listed badly, and the additional weight caused her to fill rapidly, and it became practically impossible to save her.

Granting, however, as we do, that there is uncertainty in respect to which of the several conditions was the proximate cause of the loss, still the defendant's evidence, when considered with plaintiff's, left the case in equipoise—a situation where, considering the whole evidence upon the issue of negligence, the Crowley Company, as the affirming party, must fail. Thayer's Treatise on Evidence, p. 369 et seq. Apparently this was the view of the learned judge of the District Court, and we are unable to say that it is against the weight of the evidence.

Decree affirmed.