## WALDIE v. HENRY STEERS, Inc.

(District Court, E. D. New York. April 14, 1926.)

No. 6529.

1. **Shipping ⊜⟶54—Charterer held liable for injury to scows going adrift from their anchorage, where they had been left for 20 hours during a gale.**

Charterer *held* liable for injury to scows which were anchored to a stake boat in an exposed place, where they were allowed to remain for more than 20 hours after commencement of a gale, which finally caused them to go adrift, when they could have been removed at any time to a safe harbor nearby.

2. **Shipping ⊜⟶54.**

Charterer of scows in charge of masters employed by owner is liable for their injury only on proof of negligence.

3. **Shipping ⊜⟶54.**

Breaking adrift of scows left anchored for more than 20 hours during a gale cannot be held inevitable accident.

4. **Shipping ⊜⟶54.**

Breaking of underwater U-bolt in concrete anchorage block, not inspected for eight months, not inevitable accident.

In Admiralty. Suit by George Waldie against Henry Steers, Inc. Decree for libelant.

William F. Purdy, of New York City, for libelant.

Macklin, Brown & Van Wyck, of New York City, for respondent.

CAMPBELL, District Judge. On and for some time prior to the 11th day of March, 1924, the wooden deck scows St. Mary's River and Waldie No. 5, without motive power, owned by the libelant, were each under charter to the respondent for an indefinite period, at a fixed price per day, the libelant furnishing and paying a captain, which charter amounted in law to a demise. The libelant knew, when the deck scows were chartered, that they would be taken to the Steers plant, at Port Eaton, Long Island, and the respondent had a stakeboat there to which boats were tied up. On the chart (Respondent's Exhibit A) the location of the loading berth is marked L, the stakeboat S, and the beach on which the boats went aground is marked G.

The stakeboat was anchored in March, 1924, to a reinforced concrete block, 6 feet by 6 feet, weighing about 20 to 25 tons, in which was a U-bolt that had been put in when the block was built, to which a 2-inch shackle with a 2-inch chain with links 9 inches long was made fast; the chain from the stakeboat to the anchor block being 80 to 90 feet long, and the depth of the water at the anchor block being 25 feet. The anchor chain on the stakeboat had broken the summer before, and not in a storm, when it had a smaller chain, and in July, 1923, the anchor block with the U-bolt, shackle, and chain which were used in 1924 was put down. At the beginning of winter, 1923, the stakeboat was taken in and the chain held up by a buoy. At the beginning of March, 1924, the stakeboat was made fast to the same chain which had been held up by the buoy, and no examination was made by the respondent of the chain, shackle, U-bolt, or anchor block below water.

There does not seem to be much, if any, conflict as to the facts so far found, but from this point there was a sharp conflict, and on such conflicting testimony I find as follows: [1] The stakeboat was in a location sheltered from easterly and southerly winds, and but little exposed to a northeasterly wind, but one in which the swell and undertow created in Huntington Bay by a northeasterly wind rendered it unsafe for loaded boats, and imposed a great strain on the anchor chain. On March 10, 1924, a little after dinner, the two scows, St. Mary's River and Waldie No. 5,

each about 100 feet long and with a load of about 700 tons, having very little freeboard, were placed at the stakeboat. There were five boats at the stakeboat, in three tiers, the first tier being starboard boat St. Mary's River, port boat Steers No. 70, second tier starboard boat Waldie No. 5, port boat Steers No. 76, third tier no starboard boat, only Steers No. 77, which was on the port side astern of the port second tier boat Steers No. 76.

When the libelant's scows were placed at the stakeboat, the wind was east and not high; but it began to increase about 4 o'clock p. m., continuing to increase in velocity and changing to northeast about 8 o'clock p. m. A northeast storm warning had been hoisted at 10 a. m. on Monday, March 10, 1924, and the Weather Bureau at its New York City office predicted strong easterly winds for the afternoon and night, which would shift to northwest on Tuesday.

The wind continued to blow hard from the northeast during the night, and about 8 o'clock a. m. on Tuesday, the 11th of March, the wind again increased, and continued to increase, and the northeast storm warning was continued. The Weather Bureau at its New York City office predicted continuance of easterly gales, that would shift to north and northwest south of Sandy Hook, late in the afternoon.

Port Eaton, Long Island, is quite a distance from New York City, and while they rely on storm warnings from that office, undoubtedly there are variations of the direction of the winds at the different points. There seems to be no conflict in the testimony that the wind had been increasing in force from 4 p. m. March 10th, and respondent's foreman says that at 9 o'clock on the morning of the 11th of March the wind changed to north. With a north or northwest wind, the stakeboat was in a position exposed to the force of the wind.

The wind blew a gale at about 11 o'clock on the morning of March 11th, and at about 1 o'clock in the afternoon of that day the stakeboat, with the five boats, including St. Mary's River, Waldie No. 5, and the Steers Nos. 70, 76, and 77, went adrift and went on the beach. The Steers No. 70 was made fast to the stakeboat by three lines, and the remaining four boats were held by her. The captain of the Waldie No. 5, fearing his boat would go adrift, on the night of March 10th attempted to put out a line to the stakeboat, but did not succeed, as his whaleboat was broken in the attempt. There was nothing further that could be done by the St. Mary's River or the Waldie No. 5.

The respondent did not attempt to bring in the boats from the stakeboat to the safe harbor, its basin, which could accommodate 12 to 15 boats, and where it was the custom to take boats in a northeast storm. The respondent had no tugboat of sufficient power on hand, either on the 10th or the 11th of March, nor did it make any effort to get a tug, to move the boats from the stakeboat. The tug generally used for shifting was undergoing repairs, and its other tug was engaged in towing. The launch which was at the plant did not have the power necessary to move the boats.

The two scows of the libelant were provided with anchors and had sufficient ropes for them, which were, according to the custom of such boats, kept in the boxes, and could have been bent on in a very short time. The scows did not attempt to anchor after they went adrift, as the stakeboat was to the windward, and, if they had anchored, might have dropped down on them. The anchor chain and shackle of the stakeboat were not broken, and the going adrift of the stakeboat and scows appears to have been caused by the breaking of the U-bolt in the anchor block.

[2] The libelant rests under the burden of showing that the damages complained of, to its two said scows, were occasioned by the negligence of the respondent, its agents or servants. The Junior (C. C. A.) 279 F. 407; Schoonmaker Conners Co. v. Lambert Transp. Co. (C. C. A.) 268 F. 102; C. F. Harms Co. v. Upper Hudson Stone Co., 234 F. 859, 148 C. C. A. 457. The stakeboat was undoubtedly a reasonably safe place with an easterly wind of the strength which was blowing on the 10th of March, when libelant's two said scows were placed at the stakeboat, and it does not seem to me that it could be charged with negligence in so placing the scows, unless it had fair warning of probable dangerous changes in the weather, and this it seems to have had by the storm warnings displayed at the Weather Bureau's New York office, which warned of a northeast gale, probably changing to northwest on the following day, because all the witnesses agree that the stakeboat was exposed to a north or northwest wind.

There was a sharp conflict in the testimony as to whether the wind would go to the northwest from the northeast and north, around by the south or by the north; but, aside from that, even if the boats at the stakeboat would be protected from a northeast wind, it clearly appears that the swells and undertow which would be created at the stakeboat by a northeast gale rendered it an un-

safe place for loaded boats to lie during such a gale. This appears to me to have been recognized by the respondent, as I find it was their custom to remove loaded boats from the stakeboat to a safe harbor in such a gale.

The danger to the scows from the northeast wind was apparent from shortly after 4 o'clock on March 10th, more than 20 hours before the stakeboat broke adrift, and yet no effort was made by respondent to move the scows to a place of safety, which was near at hand. Even if it be held that the stakeboat was a safe place in a northeast gale, it was not a safe place with a strong northerly or northwesterly wind, and the northwesterly wind was predicted for the following day, before the boats were taken to the stakeboat, and the wind shifted to the north at 9 o'clock a. m. on the morning of the 11th day of March, four hours before the stakeboat, with the scows, went adrift, and respondent made no effort to remove the scows of the libelant to a place of safety, which was near at hand.

Waiving all question of whether the respondent was guilty of any negligence in originally placing the scows at the stakeboat, it was guilty of negligence in allowing them to remain there for a period of over 20 hours, after the wind had reached such a velocity that the danger of the boats was apparent, and it was the duty of the respondent as bailee to have a shifting tug available to move such barges from the place of danger to a place of safety. Empire Brick & Supply Co. v. Hines (D. C.) 300 F. 683.

Many cases have been cited by both sides on the question of the duty of the respondent to observe storm warnings issued by the Weather Bureau, and while, in my opinion, they should have been observed by respondent, yet a decision of that question does not seem necessary, in the face of the fact that the agents or servants of the respondent, at Eaton's Neck, had actual knowledge of the velocity of the wind and the conditions of the water for over 20 hours before the stakeboat went adrift, and made no effort to obtain the assistance of a shifting tug to move the boats to a place of safety. And it is further to be noted that reliance was placed upon an anchor block U-bolt, shackle, and chain which, in so far as the same was under water, had not been inspected from the time they were placed more than eight months before.

[3] There is no evidence in the case which would support the contention that the scows could not have been safely moved from the stakeboat to a place of safety, nor is there any evidence that the stakeboat broke adrift as the result of a sudden and unexpected gale; on the contrary, the gale was reasonably to be expected from the weather on the preceding day, and the wind had been blowing hard for over 20 hours, therefore respondent cannot be absolved on the claim of inevitable accident. The Anna C. Minch (C. C. A.) 271 F. 192; The Surf (D. C.) 132 F. 880.

[4] The breaking of the U-bolt, in view of the fact that it had not been inspected since the anchor block was lowered the July before, cannot be held to be inevitable accident. Woodmancey, 1925 A. M. C. 1059. The course taken by the boats when they went adrift with the stakeboat was almost south, indicating that the wind was then a northerly rather than a northeasterly wind.

The three faults alleged by the respondent against the libelant, that the scows did not carry anchors, that those in charge of the scows in libelant's employ failed to put out the anchors, and that libelant's employees in charge of the scows failed to do anything to protect the boats when the storm came on, were all disproved. The scows had anchors and proper ropes, which according to custom were kept in the boxes and not bent on, but could have been in a very short time.

The anchors could not have been used with safety, but would in all probability have been a source of greater danger, if used, because in that event the stakeboat, which was to windward, might have dropped down on and sunk the barges, as the stakeboat was higher, and it was better seamanship to take the chance of going on the beach. The Sunnyside, 251 F. 271, 163 C. C. A. 427.

The scows were without motive power, and there was nothing which those in the scows could have done to protect the boats when the storm came on. The libelant was without fault. The respondent was solely to blame.

A decree may be entered in favor of the libelant, with costs and the usual order of reference.