## DELAWARE DREDGING CO. v. GRAHAM.
### THE J. D. GRAHAM.
#### No. 81.

District Court, E. D. Pennsylvania.
July 2, 1930.

Howard M. Long, of Philadelphia, Pa., for libelant.

Lewis, Adler & Laws, of Philadelphia, Pa., for respondent.

### KIRKPATRICK, District Judge.

On the afternoon of June 19, 1929, the tug J. D. Graham took the libelant's scow No. 3 and launch No. 6 in tow, tandem, in the order named, at Howell's Cove near Gloucester and proceeded with them down the Delaware river bound for Wilmington. There were no employees of the libelant upon any of the vessels, and the scow and launch passed into the exclusive custody and control of the respondent at the beginning of the journey. Before delivery to the tug, the scow had been loaded by the libelant's employees with some 4,000 feet of dredging pipe, weighing about 30 tons. She was a deck scow 72 feet long, 24 foot beam, and 6½ feet in depth, and the pipe was piled upon her deck, lengthwise, in sections. As loaded, she drew approximately 3 feet of water, which gave her a freeboard of from 3 to 3½ feet. She was at least ten years old. On the morning of the day in question she had been pumped out.

The day was clear with little or no wind and an ebb tide. The vessels proceeded without incident down the river at the rate of approximately five miles an hour until they reached a point just north of Marcus Hook and some twelve miles below the point from which they had started. There the scow suddenly sank, pulling the launch down with her.

Four witnesses saw her go down. Graham, the master of the tug, heard the pipe rattle, looked, and saw it rolling on the deck toward the Jersey shore, and then saw the scow "nose-diving down to the bottom." Emory, cook on the tug, heard the pipe rattle and looked back, saw the scow list and slide "right under the water." Whiteside, deck hand on the tug, felt a swell from a passing steamer, saw that the tug was rocking and the pipes beginning to roll. He testified that the scow listed toward the Pennsylvania shore, recovered partially, spun a little, and "came up in the front and right down at the back." In a prior statement he had said that the scow went down by the "forward port corner," and when this was called to his attention, was unable to say which account was correct. Tegland, who had tied up to the stern of the launch with two small boats for a free tow down the river and whose line to the launch had parted just before the sinking, saw the pipe roll into the river and about half a minute later saw the scow go down.

The testimony of these eyewitnesses leaves the cause of the sinking unexplained. It is clear that there was no collision with anything in the river at any time during the trip down. Tegland's testimony that he thought "something had struck her" because the boat was jerking on his line is of little value, as he was lying on his back reading a letter and the jerking might have come from the rolling of the scow, which all agree preceded the sinking. The suggestion that the tug was going too fast and "towed the scow under" is without any testimony whatever to support it.

Possibilities which might have accounted for the sinking are:

(a) Displacement waves or swells from a passing vessel or vessels. I find as a fact, basing the finding upon the testimony of Whiteside, that the vessels in the tow encountered some swell immediately before the sinking. I find further that this swell was not of an unusual or extraordinary kind nor sufficient to have caused the sinking of the scow had she been seaworthy and properly loaded. The contention of the libelant is that the tugmaster was negligent, first, in failing to keep out of the main channel in order to avoid such swells, and, second, in failing to slacken speed or stop at the approach of a vessel. As to the first contention I do not think that tugs with tows are bound

to keep out of the ship channel of the Delaware river between Philadelphia and Wilmington, under ordinary conditions of navigation, such as obtained on the day of this sinking. As to the second, while the evidence is conflicting, the weight of it is to the effect that the vessel causing the swell overtook the tug and her tow from behind. In such case, unless it is evident that the approaching vessel will pass very close, or is making an exceptional disturbance in the water (and neither was the case here), there is no duty upon the tugmaster to slacken speed or stop. If the swell of the passing vessel contributed to the accident, it could have done so only in co-operation with unseaworthiness or improper loading. However, I make no finding as to this, merely holding that the fact that the scow did encounter some of the swell or displacement waves of a passing vessel does not involve any fault of navigation on the part of the tugmaster.

(b) Unseaworthiness. There was much conflicting evidence taken upon this point. It might be possible to reach the conclusion that the scow was unseaworthy either from the testimony as to her condition after she was raised or by the process of eliminating all other possible causes for the sinking. In view, however, of my conclusion as to the burden of proof in this case (which will be fully discussed), it is not necessary to make any finding upon this point, and I make none.

(c) Improper loading, co-operating with the swell or displacement waves from passing vessels. What has just been said in regard to the unseaworthiness of the scow applies to this point also, and I make no finding here.

The fact situation thus presented may be summarized as follows: The libelant has shown that the scow was taken into the exclusive custody and control of the respondent and that while in such custody and control she sank. The circumstances of her sinking have been fully presented to the court by testimony. They do not disclose any fault or negligence on the part of the respondent.

It has been held that the owner of a tug to whom a vessel has been delivered under the ordinary contract of towage is a bailee for hire. Doherty v. Penna. R. Co. (C. C. A.) 269 F. 959; Bust v. Cornell Steam-Boat Co. (C. C.) 24 F. 188. Whether this view need be adopted, or whether the bailment arising under such contract is sui generis, the law in the federal courts, as to the responsibility of the tugowner for loss or damage to the tow and as to the burden of proof in causes arising from such loss or damage, is well settled. The measure of the tugowner's duty to the tow is ordinary care and diligence. He is not a common carrier nor an insurer, but is liable only for loss caused by his negligence. In a cause of loss or damage the libelant has a prima facie case if he shows that such loss or damage occurred while the subject of the bailment was in the exclusive custody and control of the bailee. This showing, however, merely imposes upon the bailee the duty of going forward with the evidence. It does not, properly speaking, constitute evidence of negligence. When the bailee accepts this duty and shows how the loss occurred, the force and effect of the prima facie case disappears. Then, unless it affirmatively appears from the evidence so produced, that the loss was caused by the negligence of the bailee, the burden reverts to the libelant (or, perhaps more properly, the burden originally upon him is revived), and it becomes incumbent upon him to produce evidence of negligence on the part of the bailee; otherwise his case fails. The result will be the same if, as in the instant case, the libelant does not choose to rest his case upon proof of delivery and failure to return, but elects to adduce evidence showing the circumstances under which the loss occurred.

In The Raymond M. White (D. C. N. Y.) 290 F. 454, 458, a case of an unexplained sinking of the barge under charter, the court said: "I am unable on the evidence to say that the barge was unseaworthy when delivered to the respondent, or to definitely fix the cause of the sinking; but the respondent is not obliged to show how the sinking happened. It is sufficient that it has shown that the sinking was not caused by its own negligence, and, such showing having been made, the burden is on the libelant to show the respondent's negligence." In Hildebrandt v. Flower Lighterage Co. (D. C. N. Y.) 277 F. 436, 437, Judge Mack (orally) said: "As I say, if there were no proof at all, except the handing over, for the failure to return they [bailees] would be liable; when there is proof of just what was done, even though cause of the particular damage is not shown, the burden of showing negligence remains on the libelant." In The Radnor (D. C.) 21 F.(2d) 982, 983, the court stated as a proposition of law bearing upon a similar situation: "That a tug is not an insurer; that the mere loss of the tow raises no presumption of fault against the tug; that it is only bound to bring to the performance of its duty, reasonable skill, and care and such consideration

as the special circumstances of the case demand; and that therefore the burden is upon the tow to show that the negligence of the tug caused the loss complained of." Citing The Morning Star (D. C.) 10 F.(2d) 538; Southgate v. Eastern Transportation Co. (C. C. A.) 21 F.(2d) 47, 49; The Ashwaubemie (C. C. A.) 3 F.(2d) 782. In The Southgate Case referred to the court said: "The happening of an accident to a tow does not of itself raise any presumption of negligence on the part of the tug"—that is to say, no presumption of fact. As has been seen, if the tow is in the exclusive possession and control of the tug, it does place upon the tug the duty of going forward with the evidence and showing the circumstances under which the loss or damage occurred.

The libelant's contention here is that it is not enough for the respondent to show the circumstances of the sinking, but that he must go further and show exactly what caused it, and that if he fails to do so it will be presumed that the cause was the respondent's negligence. The fallacy of this position is that it is an attempt to convert a rule of law requiring the respondent to produce some evidence into an inference (or presumption) of fact—the practical equivalent of affirmative proof of negligence. The distinction between the two is clearly pointed out by Wigmore in his work on Evidence, at section 2487 et seq.

The decision most strongly relied on by the libelant's proctor, The Drifter (D. C.) 35 F.(2d) 1006, 1007, accords with the law as stated in this opinion rather than as contended for by him. In that case the bailee produced no satisfactory evidence of the circumstances under which the damage occurred. The court said: "I believe the libelant's witnesses that * * * neither Rhodes nor Simpson could explain when, how, or where the damage happened." In other words, the bailee in that case wholly failed to meet the burden of going forward with the evidence. The court's statement that "when, as bailee, a towing vessel receives her tow in good condition and delivers it damaged, without being able to explain the damage, there is a presumption of negligence on her part, and she must be held liable," undoubtedly means without being able to give any satisfactory account of the circumstances under which the damage was incurred.

The remaining decisions cited by the libelant, as well as a number of others in which a presumption of negligence was held to exist, fall into two general classes: First, those

in which the bailment was under charter party; and, second, those in which the inference of negligence could be drawn from the circumstances of the accident by the evidence.

With regard to the first class, the exact terms of the charter parties involved in them do not usually appear, but it may be observed that the ordinary charter party contains an express covenant for the return of the vessel in good order and condition. Apart from the terms of the instrument, a bailee under charter party may be under a heavier duty as to the proof required of him than an ordinary bailee for towage, upon the theory that a chartering implies greater familiarity with the vessel chartered, a longer term of exclusive possession and, consequently, greater opportunities of knowing the cause of the loss or damage. No such implication arises where there has been merely an informal delivery for towage. In such case, when the bailee has shown exactly what happened, he has, ordinarily exhausted any knowledge which may have been more available to him than to the bailor. The facts of the instant case afford an excellent reason for this distinction. Here the scow had been delivered to the tug, already laden, barely two hours before she sank. While, technically, she came into the exclusive control and custody of the tug, no employee of the respondent had, so far as appears, ever been on board her, and no physical act had been performed upon her by the respondent beyond the mere matter of picking her up and towing her. Actually, the respondent was in very little better position to know the cause of the sinking than the libelant, and when the respondent had disclosed exactly what happened, the parties were on equal terms so far as means of knowing the cause are concerned. The distinction which usually exists between cases involving vessels under charter and vessels delivered merely for towage was pointed out in The Monongahela (C. C. A.) 282 F. 17, 21, in which case the general rule stated in this opinion was followed; the court saying: "Granting, however, as we do, that there is uncertainty in respect to which of the several conditions was the proximate cause of the loss, still the defendant's evidence, when considered with plaintiff's, left the case in equipoise—a situation where, considering the whole evidence upon the issue of negligence, the Crowley Company, as the affirming party, must fail." In Terry & Tench Co., Inc. v. Merritt & Chapman Derrick & Wrecking Co. (C. C. A.) 168 F. 533, the bailment was under a charter party and the barge had been loaded by the bailee.

By far the greater number of decisions in which a presumption of negligence on the part of the bailee has been invoked are cases in which the evidence showed that the accident was not such as ordinarily occurs when due care is used. The presumption thus applied is a true presumption of fact, Wigmore, § 2491, that is, an inference to be drawn from the facts proven or, as he puts it, "the rational potency, or probative value, of the evidentiary fact." In all of these cases, the circumstances of the loss were proved, though the explanation of them or precise cause of the accident may not have appeared. In none of them was the inference of negligence drawn from the bare facts of delivery and failure to return. The situation presented in these cases practically called for the application of the doctrine res ipsa loquitur. This doctrine is, of course, independent of any contractual relation which may exist between the parties, and is simply to the effect that when an accident occurs under certain circumstances, the instrumentalities producing it being all in the exclusive control of the defendant, an inference of negligence may be drawn without proof of the precise cause of the accident. The rule does not apply in all cases in which the defendant is in control of the things causing the happening, but only where the accident is not such as happens when due care is taken.

Thus, in The Genessee (C. C. A.) 138 F. 549, 550, the cause of the accident was clearly shown to be the pounding against one another of the vessels in a flotilla under heavy sea. The court pointed out that no effort was made on the part of the tug to ascertain whether the rear boats of the flotilla were riding safely or whether anything ought to be done to mitigate the risks to which they were exposed. The court said: "The case is a proper one for the application of the rule that a presumption of negligence arises against a bailee for hire when it appears that the subject of the bailment has been injured or destroyed while within his custody by an accident such as in the ordinary course of things does not happen when a bailee uses due care." In Schoonmaker Conners Co., Inc., v. Lambert Transp. Co. (C. C. A.) 268 F. 102, the deck and sides of a scow under charter party, when returned, were found to be eaten and decayed. It was shown that, while in the exclusive possession of the charterer, a great quantity of caustic soda in drums had been loaded on the scow's deck, where it had remained for a long time under such conditions that some of it had leaked from the drums. The inference of negligence was an inference of fact to be drawn from the circumstances and did not depend upon any question of burden of proof. In O'Brien Bros., Inc. v. City of New York (C. C. A.) 9 F.(2d) 542, the sinking of the scow was held due to misplacement of the load by the contractor employed by the charterer. Again a clear inference of fact. While it was stated that the burden of proof was on the bailee to show how the injury occurred and to establish that it was free from negligence, the court found as a fact that the sinking was due to the instability of the load, which in turn was due to the manner of loading by the bailee's agent.

In Newport News Shipbuilding & Dry Dock Co. v. United States (C. C. A.) 34 F.(2d) 100, the loss was due to fire which broke out upon a vessel delivered to the bailee for repairs, in a part of the vessel where only employees of the bailee were present. The court distinguished the case before it from Southern Railway Co. v. Prescott, 240 U. S. 632, 36 S. Ct. 469, 473, 60 L. Ed. 836, on the fact that the bailee was a bailee for the purpose of work and repair and not a mere custodian. The point of the distinction is, of course, that in the former class of bailments the bailee is by the nature of his contract supposed to be at work upon the subject of the bailment. Hence when an accident occurs the inference that it is due to his negligence is logically stronger than where he is merely holding the article for safe keeping. In the case of a bailment as warehouseman only or for safe-keeping, the Supreme Court in Southern Railway Co. v. Prescott, supra, laid down the law as follows: "The plaintiff, asserting neglect, had the burden of establishing it. This burden did not shift. As it is the duty of the warehouseman to deliver upon proper demand, his failure to do so, without excuse, has been regarded as making a prima facie case of negligence. If, however, it appears that the loss is due to fire, that fact in itself, in the absence of circumstances permitting the inference of lack of reasonable precautions, does not suffice to show neglect, and the plaintiff, having the affirmative of the issue, must go forward with the evidence." The bailment in the instant case does not come directly under either of the two classes just considered. The circumstances of the bailment however bring it much closer to the latter than the former.

I hold as a matter of law that as soon as the circumstances of the sinking were shown, since they did not show negligence on the part of the tug, the burden of proof

fell upon the libelant to produce affirmative evidence of such negligence. No evidence of such negligence was produced.

The libel, therefore, may be dismissed.