### ATLANTIC REFINING CO. v. UNITED STATES.

#### THE POINT BREEZE.
No. 149 of 1946, Admiralty.

United States District Court
E. D. Pennsylvania.
July 20, 1948.

On Decree Nov. 22, 1948.

Otto Wolff, Jr., of Philadelphia, Pa., for libellant.

J. Frank Staley, of Washington, D. C., for United States.

KIRKPATRICK, Chief Judge.

The libellant, owner of the M/V Point Breeze, filed this libel to recover a balance of charter hire due for the months of January and February, 1945. The respondent claims, as a set-off, towage services during the month of July, 1944, from Aruba, West Indies, to the Port of New York. The services were made necessary by reason of the fact that the starboard generator of the Point Breeze became disabled en route to Aruba and she could not maintain convoy speed on the home voyage without the assistance of a tug. A tug was provided and with its assistance the Point Breeze arrived at Bayonne, New Jersey, on August 4, 1944, and there discharged her cargo. On the same day an Amended Charter became effective by agreement of the parties and the libellant contends that, since the

claim for towage services arose before the Amended Charter became effective, it is a claim growing out of a different transaction from the one upon which the libel is based and that, therefore, it cannot be used as a set-off in a court of admiralty.

In the first place I think that the chartering of the Point Breeze by the United States for the period beginning April 20, 1940, to end with the voyage current at the termination of the war emergency (but actually ending with her sale to the government May 4, 1945) was one transaction. It is true that the charter was amended in various particulars at several different times, by what were called addendums, changing the rate of hire and insurance valuation and that on August 4, 1944, what was called an "Amended Charter" was put into effect. Strictly speaking, each time a change occurred there was a new meeting of minds of the parties and no one can dispute Judge Hough's pronouncement in United Transportation & Lighterage Co. v. New York & Baltimore Transp. Line, D.C., 180 F. 902, 904, that "A contract once made cannot be modified except by a new meeting of minds, and, when such mind meeting occurs, a new contract springs into existence." But, when it comes to applying the admiralty rule that the respondent may not set off a claim not growing out of the same transaction as that which forms the basis of the libel, there is no need to take a legalistic view of the situation. Technically, there were new contracts made but in the view of the law as well as in the minds of these parties themselves the hiring of this vessel was one transaction. The charterer's complete control of its movements has been continuous and uninterrupted from the beginning and this, it seems to me, is the essential thing. So far as it adds anything, it is plain that the parties to the contract took this view of it. The recitals of the Amended Charter describe it as an agreement "to amend the Charter effective upon the date hereinafter set forth so that such Charter will be as follows:"

I, therefore, conclude that the set-off claimed by the respondent is properly raised by its answer.

The respondent contends that the libellant failed to use due diligence to maintain the Point Breeze in a seaworthy condition and that the breakdown of the starboard generator and the towing services required because of it were due to the owner's failure in this respect.

The burden of proof, that the owner did not exercise due diligence and that failure to do so resulted in the accident to the generator, was upon the charterer.

The cases cited by the charterer for the proposition that the burden was upon the shipowner are mostly Harter Act cases and do not apply to the situation here. The Harter Act, 46 U.S.C.A. § 190 et seq., provides a statutory exemption from liability upon a certain condition, namely, that the owner exercise due diligence and, of course, the owner must show that he has complied with the condition in order to bring himself within the exemption. Hence, the burden of proof in such cases is necessarily upon the owner.

The other cases cited by the libellant upon this point decided no more than that, when certain types of unseaworthiness develop within a comparatively short time after the ship leaves port, the presumption is that the condition existed before she sailed and that, therefore, an absolute warranty of seaworthiness contained in the charter had been breached. The Edwin I. Morrison, 153 U.S. 199, 14 S.Ct. 823, 38 L.Ed. 688, and American Asiatic Co. v. Robert Dollar Co., 9 Cir., 282 F. 743.

The rule as to the burden of proof and presumptions in the present case may be stated as follows:

The owner's duty to the charterer arose from the contract between them and the measure of it in respect of the generators was due diligence to maintain them in a seaworthy and workable condition. The vessel at the time of the breakdown was in the exclusive possession and control of the owner and in such case the charterer has a prima facie case as soon as he shows those facts. This showing, however, merely imposes upon the owner the duty of going forward with the evidence. It does not, properly speaking, constitute evidence of negligence (in this case,

absence of due diligence) or raise a presumption of negligence.

In the present case the owner accepted this duty and proceeded to show exactly what happened and how the breakdown occurred. When it had done so, the force and effect of the charterer's prima facie case disappeared. The action, it must always be borne in mind, is for breach of contract, and at that point, unless it has affirmatively appeared from the evidence produced by the shipowner that the breakdown was caused by failure to exercise due diligence in accordance with the terms of the contract, the burden reverts to the charterer (or perhaps more properly the burden originally upon him is revived) and it becomes incumbent upon him to produce evidence of the owner's failure to use due diligence, for, otherwise, his case fails.

In the present case the charterer produced no evidence relating to the cause of the breakdown and the question, therefore, is whether it affirmatively appears from the evidence produced by the owner that it was caused by want of due diligence or, conversely, that it could have been prevented by the exercise of due diligence.

The foregoing statement of the rule is substantially that which this Court made in Delaware Dredging Co. v. Graham, D.C., 43 F.2d 852. In that case, as in this, the loss occurred at a time when all the instrumentalities were in the exclusive possession and control of the respondent.

The evidence before me does not show that the breakdown of the generator was caused by negligence or want of due diligence on the part of the charterer or that it could have been avoided by reasonable inspection—that is, such inspection as prudent and careful shipowners give their ships.

The testimony shows that the breakdown was due to a spacer piece in the armature coming loose and getting into the air space between the moving and stationary parts of the generator, thus grounding the generator and physically damaging it. The spacer pieces are small pieces of metal welded in position between laminated sections of the armature. Nine generators of this type had been in use since 1927 and no such mishap had occurred previously. The spacer pieces were welded in position so that it was not considered necessary to examine them. Such an examination would entail the disassembling of the entire unit and the individual inspection of several hundred little pieces of steel inserted in the spaces of the armature. It appears to be the fact that it had never been considered necessary and had not been, prior to this accident, normal inspection practice to make the very elaborate examination that would be required to discover the possibility that one of these spacer pieces might become loose.

I, therefore, find as a fact that the breakdown of the generator was not caused by negligence or want of due diligence on the part of the charterer and conclude that the charter was not breached.

### Cross-Libel

The respondent filed a cross-libel to recover charter hire alleged to have been erroneously paid, the contention being that the provision of the Amended Charter requiring the Point Breeze to be in a seaworthy condition on delivery so far as due diligence could make her was breached in that her starboard generator was unworkable at the time the Amended Charter came into effect on August 4, 1944, and repairs were not completed until September 8, 1944, and that this condition was due to the fact that the owner had theretofore failed to use due diligence in maintaining it.

The Point Breeze arrived at Bayonne, New Jersey, with her starboard generator out of commission and finished discharging cargo there on August 4, 1944. From Bayonne she proceeded to Philadelphia, at which point beginning August 10, 1944, and ending September 9, 1944, she underwent her annual overhauling and inspection, in the course of which the starboard generator was repaired.

On August 4, 1944, at 7:25 (7:55) p. m. by virtue of the "Charter Status Certificate" the Amended Charter, became effective. It is plain that the parties did not intend that, whatever changes in their contractual relation were effected by the Amended Charter, there should be any redelivery of the vessel to the owner at Bay-

onne. I fully agree with the libellant (cross-respondent) that it was not the intention of the parties to terminate the original charter by any redelivery of the vessel to the owner, or otherwise. For one thing, had there been such a redelivery, the vessel could not have been rechartered by the War Shipping Administration except in accordance with the provisions of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1101 et seq., and the President's Executive Order No. 9054 of February 7, 1942, 50 U.S.C.A.Appendix, § 1295 note. Clauses (e) and (f) of Part I of the Amended Charter, which called for the designation of a "port of delivery" and a "time and date of delivery", were intended merely to fix the port, time and date at which the Amended Charter became effective. If there is any doubt about this, it is resolved by the letter of August 10, 1945, from the War Shipping Administration to the owner, expressly agreed to by the owner, in which the parties adopt this construction of the delivery clauses of the Amended Charter.

█ Thus, when the Point Breeze arrived at Philadelphia she had not been redelivered to the owner but the changes in the charter, effected on August 4, 1944, were in force. There having been no redelivery by the charterer to the owner and no subsequent new placing of the vessel at the disposal of the charterer, Clause 1 of the Amended Charter did not have any application and the whole contention of the government and the government's claim to damages based on the fact that the vessel was not, on August 4, ready to receive cargo and fitted out for normal service cannot be considered. Even if it could, it would be more than questionable whether, in view of the fact that the condition of the vessel was fully known to the government'when the Amended Charter went into effect, it could be sustained. Moreover I have already found that the breakdown of the generator and its consequent defective condition on August 4 was not caused by or due to any lack of due diligence on the part of the owner.

█ Only two clauses of the Amended Charter have any application to the situation presented by the government's claim.

Clause 8(c) provides for a reduction in charter hire in the event that the vessel is physically incapable of working for a period in excess of 20 days while in a continental United States port. Clause 12 provides for dry-docking for the purpose of cleaning and painting, clearing the vessel of oil and gas and places the expense and port charges incurred for these operations upon the owner. It significantly does not, as does Clause 12 of the 1942 charter, provide for suspension of charter hire as well. The Point Breeze was certainly physically incapable of working during the time required to repair the generator (August 10 to September 8) and I think that she was also physically incapable of working within the meaning of Clause 8(c) as long as she was dry-docked for cleaning, painting and other necessary repairs incident to her annual inspection. Consequently, the reduction in charter hire should be computed in accordance with Clause 8(c) of the Amended Charter.

█ The libellant (cross-respondent) contends that this Court is without jurisdiction to consider the claim made in the cross-libel, basing its contention upon the well recognized rule that courts of admiralty, although conforming to equitable principles in the disposition of matters before them, are without jurisdiction to enforce the equitable remedy of account.

█ In both the libel and cross-libel the principal issue before this Court arises out of alleged failure on the part of the owner to exercise due diligence, in other words, breach of a term of the charter, a maritime contract, and within the Court's admiralty jurisdiction. In the libel the breakdown itself gave rise to the set-off claimed by the respondent. In the cross-libel the overpayment which the government seeks to recover is alleged to have been occasioned by the 'fact that the term of the charter, to the effect that the vessel would be seaworthy on delivery so far as due diligence could make her, was breached by the broken-down generator, giving rise to a claim for damages which the government mistakenly failed to set off against hire. The account between the parties is no doubt complicated but there seems to be no dispute as to any item in it and I see

no reason why the Court has not jurisdiction of these two isolated claims which are susceptible of exact determination and adjudication without reference to any other items of debit and credit between the parties and which arise out of a maritime contract.

A decree may be presented in accordance with the foregoing.

### On Decree.

■ Section 3 of the Suits in Admiralty Act, 46 U.S.C.A. § 743, provides that a decree against the United States may include interest. Conceding that the matter lies in the discretion of the Court, the libellant argues that interest in admiralty causes is invariably allowed in the absence of a specific reason for its disallowance. That is a pretty broad statement, but accepting it for this discussion, there is certainly in this case a specific reason for disallowing interest.

The Second Disputes Addendum dated January 10, 1945, Part III, Article Third, which amends the charter and governs the contractual relations between the parties, provides "No interest * * * shall become due or payable by the Charterer by reason of delay in payment of any charter hire or any other sums accruing under this Charter * * *" The libellant's argument that this means "mere" delay and does not apply to a case in which a charterer has denied liability and refused to pay cannot be sustained. The addendum dealt with disputes and with nothing else and when the parties referred to delay in the payment of charter hire they must have had in mind delay by reason of a dispute. Of course, disputes almost always involve denial of liability and refusal to pay at least some part of a sum of money claimed. A provision for delay in cases of mere neglect or inadvertence to perform an admitted obligation would have no place in a special contract dealing with the subject of disputes.

Even if the word "may" in Section 3 of the Suits in Admiralty Act had been "shall", I see no reason why the owner by contract could not have waived interest.

The final decree will be entered without interest.